IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

THE STATE OF ARIZONA,
*Appellee,*

*v.*

SHAWNA FORDE,
*Appellant.*

No. CR-11-0043-AP
Filed January 17, 2014

Appeal from the Superior Court in Pima County
The Honorable John S. Leonardo, Presiding Judge
No. CR20092300-001

**AFFIRMED AS MODIFIED**

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Robert L. Ellman, Solicitor General, Jeffrey A. Zick, Chief Counsel, Capital Litigation Section, Susanne Bartlett Blomo, Assistant Attorney General (argued), Phoenix, for State of Arizona

Amy Armstrong, Director, Natman Schaye, Julie Hall (argued), Arizona Capital Representation Project, Tucson, for Shawna Forde

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BERCH, VICE CHIEF JUSTICE BALES, JUSTICE PELANDER, and JUSTICE BRUTINEL joined.

JUSTICE TIMMER, opinion of the Court:

¶1 Shawna Forde was sentenced to death after a jury found her guilty of two counts of first degree felony murder and six other felonies committed during a home invasion. We have jurisdiction over her

automatic appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.[1]

## BACKGROUND[2]

**¶2** Forde was the self-proclaimed leader of a private "minuteman" border monitoring group. To fund her operation, she planned to steal from a house in Arivaca owned by victim Raul Flores, a reputed drug dealer. In May 2009, Forde met with minuteman members in Colorado, discussed her plan, and sought their help. She also sought assistance from Arivaca drug dealers Albert Gaxiola and Oin Oakstar, who had been plotting to kill Flores as a perceived rival in the drug trade. A few days before the murders, Forde and Jason Bush, her "number two guy" in the minuteman group, met with Gaxiola and Oakstar and discussed killing Flores and stealing drugs and money.

**¶3** On the morning of May 29, as Oakstar, Forde, and Bush slowly drove by Flores's home, Flores's wife Gina and their nine-year-old daughter Brisenia were in the front yard. Gaxiola later asked Oakstar to go with him to "take care" of Flores, but Oakstar declined, saying he was too drunk.

**¶4** That night, Forde and Bush returned to Flores's home with Gaxiola and at least one other person. Forde awakened the family by banging on the front door and shouting. When Flores opened the door, Forde demanded entry or else, she said, "we're going to shoot you." Flores stepped aside, and Forde and Bush, dressed in camouflage and Bush with a blackened face, rushed in. While Bush, who was armed, stood by, Forde ordered Flores to sit near Gina, who was seated on a couch where Brisenia lay sleeping.

---

[1] We cite the current versions of statutes unless material changes have been made since Forde committed the offenses.

[2] We view the facts in the light most favorable to sustaining the jury's verdicts. *State v. Garcia*, 224 Ariz. 1, 7 ¶ 2 n.1, 226 P.3d 370, 376 n.1 (2010).

¶5        Flores asked what was occurring, and Bush replied, "don't take this personal[ly] but this bullet has your name on it." Flores jumped up and wrestled with Bush, and Bush shot him. Bush then shot Gina twice, and she fell to the floor and pretended to be dead. Flores shouted for Bush to stop, prompting Bush to shoot Flores several more times, killing him. During these shootings, Forde did not react or ask Bush to stop.

¶6        Forde then announced that everything was clear, and two other intruders entered the house. Forde left the room and began rummaging through drawers in the master bedroom. Meanwhile, Bush questioned Brisenia and then shot her twice, killing her. Forde returned to the living room saying they needed to hurry because someone was coming. The intruders then broke the lights in the house and ran out.

¶7        Gina called 911. While she was on the telephone, Forde, who had shed her camouflage jacket and pulled her hair into a ponytail, came back into the house to retrieve a dropped gun. Forde spotted Gina and ran outside, shouting for someone to "finish [her] off." Bush re-entered the house and began firing at Gina, who returned fire, injuring Bush and prompting him to flee. Gaxiola then entered the house but quickly departed after realizing Gina had recognized him. Shortly thereafter, the intruders left.

¶8        Forde, Bush, and Gaxiola went to Gaxiola's home. Gaxiola returned to observe the murder scene and texted Forde saying, "cops on scene, lay low." Forde responded, "no worries, all good, just relax, competition gone." She then took care of Bush's wound. A few hours later, she texted her daughter saying, "whatever goes down, I'm in deep now. I love you, make me proud, and do something good with your life."

¶9        After learning of the murders, R.W. and R.C., who had attended the Colorado minuteman meeting, called the FBI and told them about Forde's plans. Police stopped Forde as she was driving on June 12 and arrested her. A belt buckle marked "G" and jewelry taken from Gina's bedroom during the home invasion were found in Forde's purse, which was in her car.

¶10        The State indicted Forde on two counts of first degree murder as well as first degree burglary, attempted first degree murder,

3

aggravated assault causing serious physical injury, aggravated assault with a deadly weapon, armed robbery, and aggravated robbery. A jury found her guilty on all counts. During the aggravation phase, the jury found three aggravating circumstances for Flores's murder and four aggravating circumstances for Brisenia's. After receiving evidence in the penalty phase, the jury determined that Forde should be sentenced to death for each murder. The trial court then imposed death sentences for the murders and prison sentences totaling seventy-five years for the non-capital counts.

## DISCUSSION

### I.    PRETRIAL

#### A.    Pretrial Publicity

¶11         Forde unsuccessfully moved to change venue from Tucson based on extensive media coverage of the crimes, some of which was inaccurate or inflammatory. We review the trial court's ruling for an abuse of discretion. *State v. Cruz*, 218 Ariz. 149, 156 ¶ 12, 181 P.3d 196, 203 (2008).

¶12         Our review entails a two-step inquiry to decide "whether, under the totality of the circumstances, the publicity attendant to defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair." *Id.* ¶ 13 (internal quotation marks omitted). We first consider whether the publicity so pervaded the proceedings that the trial court erred by not presuming prejudice. *Id*. ¶ 14. If not, we ask whether the defendant showed actual prejudice. *Id.* Forde does not assert the existence of actual prejudice but argues that the trial court erred by failing to presume prejudice.

¶13         A court presumes prejudice "only if the 'media coverage was so extensive or outrageous that it permeated the proceedings or created a carnival-like atmosphere.'" *Id*. at 157 ¶ 15, 181 P.3d at 204 (quoting *State v. Atwood*, 171 Ariz. 576, 631, 832 P.2d 593, 648 (1992)) (internal quotation marks omitted). The publicity must be so unfair, prejudicial, and pervasive that jurors could not decide the case fairly, even if they avow otherwise. *State v. Bible*, 175 Ariz. 549, 565, 858 P.2d 1152, 1168 (1993). The burden to show presumed prejudice is "extremely

heavy." *Id*. at 564, 858 P.2d at 1167 (quoting *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985)).

**¶14** The publicity surrounding this case was not so pervasive and prejudicial that the court should have presumed prejudice. Most of the publicity occurred in the immediate aftermath of the crimes — approximately eighteen months before trial. Moreover, most news accounts were essentially factual. We have held that the trial court properly refused to presume prejudice under similar circumstances. *See, e.g.*, *Cruz*, 218 Ariz. at 157 ¶ 18, 181 P.3d at 204 (finding no presumed prejudice when publicity occurred more than a year before trial and was almost entirely accurate); *State v. Blakley*, 204 Ariz. 429, 434 ¶ 15, 65 P.3d 77, 82 (2003) (refusing to presume prejudice when local inflammatory news stories appeared primarily at the time of the crime or in pretrial stages); *Bible*, 175 Ariz. at 563–64, 858 P.2d at 1166–67 (finding news containing inadmissible or inaccurate evidence did not create presumed prejudice when the stories of rape and murder of nine-year-old child were published "months before trial began" and nearly all coverage was based on factual evidence admitted at trial).

**¶15** Forde asserts that the trial court erroneously discounted the significance of internet news stories because, although they were published well before her trial began, they remained accessible online. Forde has not shown, however, that the continuing availability of internet news equates to continuing coverage and, more importantly, continuing readership by prospective jurors.

**¶16** Forde also argues that a change of venue was warranted by the extensive publicity surrounding the January 8, 2011 shootings of Congresswoman Gabrielle Giffords and others in Tucson (the "Giffords shootings"), which occurred just three days before the originally scheduled start of trial. Because Forde never asked for a change of venue on this basis, we review only for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005). Under this standard of review, Forde bears the burden of proving that fundamental error occurred and that it prejudiced her. *Id*. ¶ 20. "Fundamental error" is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, [or] error of such magnitude that the defendant could not possibly have received a fair trial." *Id*. ¶ 19.

**¶17** We do not find any error, much less fundamental error. Forde made no showing that publicity about the Giffords shootings had a spill-over effect on Forde's trial or created a carnival-like atmosphere in this case. Although this case and the Giffords shootings each involved the shooting death of a nine-year-old girl, this common element is insufficient to justify a presumption that the publicity surrounding the Giffords shootings deprived Forde of a fair trial. *See State v. Lane*, 431 S.E.2d 7, 9 (N.C. 1993) (holding that a change of venue was not warranted due to publicity surrounding an unrelated murder with common features because the defendant failed to establish any specific prejudice against him as a result of the publicity).

### B. Motions to Continue

**¶18** Forde argues that the trial court violated her rights to due process, a fair trial, effective assistance of counsel, and to be free from cruel and unusual punishment by denying motions to continue the trial because (1) the State belatedly disclosed evidence that necessitated investigation, and (2) the Giffords shootings on the eve of trial tainted potential jurors. A trial court must grant a continuance "only upon a showing that extraordinary circumstances exist and that delay is indispensible to the interests of justice." Ariz. R. Crim. P. 8.5(b). We review a trial court's denial of a motion to continue for an abuse of discretion, *State v. Dixon*, 226 Ariz. 545, 555 ¶ 53, 250 P.3d 1174, 1184 (2011), which we will find only if the defendant demonstrates prejudice, *State v. VanWinkle*, 230 Ariz. 387, 390 ¶ 7, 285 P.3d 308, 311 (2012).

### 1. Late Disclosure

**¶19** In the hours after the shootings, a text message was sent from Forde's cell phone stating that "Red" had been injured; Bush was nicknamed "Red." Less than a week before the January 11, 2011 start of trial, the State disclosed FBI reports containing a witness's statement that Leland "Red" Sprout had been involved in the shootings. Forde moved to continue the trial so she could investigate, claiming that evidence of Sprout's involvement was exculpatory because Forde had no connection to him and it impeached the witness, who had not mentioned Sprout during defense interviews. The trial court denied the motion, finding that the information had only speculative evidentiary value and would not be

materially exculpatory. But the court permitted Forde to re-interview the witness, who later testified at trial.

¶20 Forde primarily argues that the trial court erred by considering whether the evidence was exculpatory rather than determining whether the late disclosure was harmless beyond a reasonable doubt, the standard applied in *State v. Krone*, 182 Ariz. 319, 897 P.2d 621 (1995). *Krone* did not alter the standard for considering trial continuances, as Forde suggests. The issue in *Krone* was whether a new trial was warranted in light of the introduction of evidence in violation of disclosure rules. *Id.* at 321, 897 P.2d at 623. Resolving that issue turned on whether the state could demonstrate harmless error. In this case, because the FBI reports were not introduced in evidence, *Krone* is inapplicable. The trial court correctly placed the burden on Forde to demonstrate "extraordinary circumstances" necessitating a continuance. *See* Ariz. R. Crim. P. 8.5(b).

¶21 Forde also argues that the belated disclosure constituted "extraordinary circumstances" justifying a continuance because an investigation could have revealed evidence of Sprout's involvement, which would have created a reasonable doubt about Forde's guilt or the appropriateness of death sentences. We disagree. Although Sprout's involvement could have cast doubt on Bush's presence at the shootings, it would not have shown Forde's absence or otherwise tended to exculpate her.

¶22 Forde further fails to show that the denial of her motion prejudiced her rights. She does not allege that her second interview of the witness was inadequate, and she does not show that the court's ruling hampered her investigation of Sprout's alleged involvement. Moreover, because the trial was ultimately continued for eight days for other reasons, Forde had additional time to investigate.

## 2. Giffords Shootings

¶23 Two days after the Giffords shootings, Forde moved to continue her trial, which had been scheduled to start the next day, arguing that trying the case in the immediate aftermath of the Giffords shootings would be unfair because jurors might transfer their emotional distress to Forde in light of similarities between the crimes. Although the court

denied the motion, it nonetheless continued the trial for eight days, in part because "the events of the past several days along with continuing developments within the community have created an atmosphere that's not conducive to going forward with the trial today." On the new trial date, Forde renewed her motion, contending that the publicity and emotions stemming from the Giffords shootings had not subsided. The trial court denied the motion.

¶24 Forde argues that the shock and grief experienced by Tucson residents after the Giffords shootings presented the type of "extraordinary circumstances" that warranted a trial continuance. She points out that her lead attorney, Eric Larsen, initially argued he was emotionally incapable of providing Forde with an adequate defense, which was later evidenced by inadequate voir dire. But Larsen later told the court that the eight-day trial continuance alleviated his personal issues. And any inadequacy in the voir dire should be considered in the context of an ineffective-assistance-of-counsel claim, which is not before us. *See State v. Spreitz*, 202 Ariz. 1, 3 ¶ 9, 39 P.3d 525, 527 (2002) (requiring "ineffective assistance of counsel claims . . . to be brought in Rule 32 proceedings").

¶25 Forde additionally contends that "extraordinary circumstances" existed because it was impossible to seat a jury not deeply affected by the Giffords shootings. As previously explained, however, Forde fails to demonstrate that the emotional distress caused by the Giffords shootings affected the jurors' ability to fairly reach a verdict.

¶26 The appropriate way to determine the impact of a significant unrelated event in the community is to question potential jurors during the voir dire process. Forde's attorney took that opportunity and questioned potential jurors about the impact of the Giffords shootings. Only one person indicated he might not be able to be fair, and the court excused him.

¶27 Accordingly, the trial court did not err by denying Forde's motions to continue.

## C.   *Dessureault* **Hearing**

**¶28**     Gina was unable to identify Forde in a photo line-up, but when Gina and Forde both attended a pretrial hearing on September 27, 2010, Gina recognized Forde as the female intruder.  Forde moved to preclude any in-court identification of her based on this pretrial identification.  Following a hearing held pursuant to *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), the trial court concluded that the identification was made in suggestive circumstances, but denied the motion because Gina's identification was nevertheless reliable.  We defer to the court's factual findings unless they are clearly erroneous, but we review the court's ruling on the constitutionality of a pretrial identification de novo as a mixed question of law and fact.  *State v. Moore*, 222 Ariz. 1, 7 ¶ 17, 213 P.3d 150, 156 (2009).

**¶29**     Forde contends that the trial court violated her due process rights by refusing to continue the *Dessureault* hearing to permit additional witness interviews, precluding evidence at the hearing, and then ruling that Gina's identification was reliable and therefore admissible.  We reject these arguments because the court was not required to conduct a *Dessureault* hearing, and therefore any error was harmless.

**¶30**     In *Perry v. New Hampshire*, the Supreme Court clarified — as this Court had previously held — that only state action requires a *Dessureault*-type hearing.  132 S. Ct. 716, 730 (2012) ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement."); *see also State v. Williams*, 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987).  The Court reasoned that decisions requiring pretrial judicial scrutiny "turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array."  132 S. Ct. at 721.  Significantly, the Court concluded that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."  *Id*. at 728.

**¶31**     Forde concedes that the confrontation between Forde and Gina at the pretrial hearing did not result from state action, and the record

supports the concession. Gina routinely attended pretrial hearings, but Forde generally waived her appearance. Nothing suggests that the State asked Gina to attend the September 27 hearing to see Forde. Indeed, Gina waited about six weeks to tell the State she had recognized Forde. Because there was no state action involved in Gina's pretrial identification of Forde, there was no due process concern, and the trial court was not required to hold a *Dessureault* hearing.

**¶32** Forde attempts to avoid *Perry* and *Williams* by arguing that because the *Dessureault* hearing was held, the court was required to comply with due process. She cites cases concerning "state-created" rights, which require due process once invoked. *See Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981) ("A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right."); *Wolff v. McDonnell*, 418 U.S. 539, 556–58 (1974) (holding that depriving inmates of state-created right to good-time credits in prison disciplinary proceedings requires due process). But the *Dessureault* hearing was not a state-created right. The fact that the court granted Forde's request for the hearing did not resurrect due process rights deemed inapplicable by *Perry* and *Williams*.

**¶33** Forde also relies on *State v. Nordstrom*, 200 Ariz. 229, 241 ¶ 26, 25 P.3d 717, 729 (2001), *overruled in part on other grounds by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012), to argue that due process concerns can sometimes be implicated "in the absence of state action" when "evidence lacking in foundation reaches the jury under circumstances that do not afford a defendant an opportunity to point out its weaknesses." The concerns set forth in *Nordstrom* are not implicated here, however, because Forde thoroughly cross-examined Gina about the inconsistencies between her initial description of the female perpetrator and Forde's appearance, as well as Gina's inability to identify Forde in the photo line-up. Further, Forde presented expert testimony challenging the identification.

**¶34** In a related argument, Forde asserts that the trial court erred by failing to give a cautionary instruction to the jury regarding eyewitness identification, as suggested by *Perry*. Forde waived this issue by not raising it until her reply brief.

### D.    Preclusion of Victim Advocate's Testimony

**¶35**        When Gina saw Forde at the pretrial hearing, she commented to her mother and her victim advocate that Forde looked like the female intruder.  Forde subpoenaed the advocate to testify at trial, but the court granted the State's motion to quash and prohibited Forde from interviewing the advocate, reasoning that the advocate was prohibited from divulging the conversation pursuant to the crime victim advocate privilege in A.R.S. § 13-4430.  Forde contends that Gina waived the privilege by testifying about the conversation at the *Dessureault* hearing, and the court therefore violated her right to confront witnesses and to due process by allowing Gina to testify about the conversation "yet block[ing] the defense from disputing that testimony with the testimony of the advocate herself."  Because Forde raises these arguments for the first time on appeal, we review for fundamental error.  *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

**¶36**        At the time of Forde's trial, A.R.S. § 13-4430(A) and (C) (2011) prohibited a crime victim advocate from disclosing "as a witness or otherwise any communication . . . between himself and the victim" unless the advocate "knows that the victim will give or has given perjured testimony or if the communication contains exculpatory evidence."[3]  The victim waives the privilege only by consenting in writing.  A.R.S. § 13-4430(A) (2011).  Because Gina did not provide written consent, she did not waive the privilege.  Also, nothing in the record suggests that the information the victim advocate might have given was exculpatory.  Indeed, Forde did not move for disclosure of the information, which would have permitted the court to hold an in camera hearing and order disclosure if it found "reasonable cause to believe the material [was] exculpatory."  A.R.S. § 13-4430(D) (2011).  The privilege required the exclusion of the conversation.

**¶37**        Application of the privilege did not violate Forde's confrontation and due process rights by allowing the State to introduce evidence of the conversation between Gina and the advocate and then blocking Forde from disputing its content.  Forde — not the State — asked

---

[3]      In 2012, the legislature amended § 13-4430(A) to prohibit the advocate from disclosing "as a witness or otherwise any communication made by or with the victim . . . ."

Gina about the pretrial hearing and her conversation with the advocate to cast doubt on the identification. Moreover, precluding the advocate's testimony did not impede Forde from cross-examining Gina or arguing that Gina's identification was unreliable. *Cf. Pennsylvania v. Richie*, 480 U.S. 39, 52–53 (1987) (holding that the right to confrontation is a trial right and is normally satisfied "if defense counsel receives wide latitude at trial to question witnesses").

### E.      Defense Counsel's Motion to Withdraw

**¶38**      Attorneys Eric Larsen and Jill Thorpe represented Forde at trial. An acquaintance of Forde, purporting to act on her behalf, filed identical bar complaints against both attorneys before trial. Citing advice imparted by the State Bar's advisory ethics counsel, Larsen moved to withdraw to enable the court to decide whether new counsel was required. Both Larsen and Thorpe stated, however, that the bar complaints would not substantially interfere with their representation. Additionally, Forde told the court that she had read one complaint, did not authorize its filing, and that she was "100 percent" satisfied with her attorneys. As a result, the court moved on to other pretrial matters, effectively denying the motion. *See State v. Hill*, 174 Ariz. 313, 323, 848 P.2d 1375, 1385 (1993) ("A motion that is not ruled on is deemed denied by operation of law."). We review the ruling for an abuse of discretion. *See State v. Jones*, 185 Ariz. 471, 480, 917 P.2d 200, 209 (1996).

**¶39**      Forde argues that the bar complaints placed the attorneys and Forde in adversarial roles that created a conflict of interest in violation of Ethical Rule ("ER") 1.7(a)(2), which prohibits representation when "there is a significant risk that the representation . . . will be materially limited by the lawyer's . . . personal interest." Because Forde did not file or authorize the bar complaints, however, she did not have an adversarial relationship with her attorneys. And even if Forde had filed the complaints, the court was not required to remove her attorneys. *See State v. Henry*, 189 Ariz. 542, 549, 944 P.2d 57, 64 (1997) (holding that, for public policy reasons, the mere filing of a bar complaint by a defendant against his attorney does not mandate removal of the attorney). Notably, nothing indicated a significant risk that the attorneys' representation of Forde would be materially limited by the bar complaints. Consequently, the court did not err by denying the motion to withdraw.

### F.     Disclosure of FBI "Source Files"

**¶40**        Months before trial, Forde moved for disclosure of all FBI "source files" regarding R.W. and R.C., attendees at the Colorado minuteman meeting, including files unrelated to this case. The trial court denied Forde's motion, finding that the information was not within the State's control and directing Forde to make her request to the FBI. When the trial began, the State received previously requested FBI source files regarding this case and promptly disclosed them to the defense.

**¶41**        Forde argues that the trial court violated her rights to due process, to present a defense, and to confront witnesses by denying her motion. She contends that disclosure was required by Arizona Rule of Criminal Procedure 15.1 and *Brady v. Maryland*, 373 U.S. 83 (1963). But neither Rule 15.1 nor *Brady* requires the state to disclose evidence outside its possession or control. *See* Ariz. R. Crim. P. 15.1(b) (requiring the state to disclose material "within the prosecutor's possession or control"); *State v. Briggs*, 112 Ariz. 379, 383, 542 P.2d 804, 808 (1975) ("The prosecutor cannot be deemed to have concealed information relating to the guilt or innocence of the accused, or punishment if he does not procure materials in the custody of the FBI, an agency which is not under the control of the prosecutor.").

### G.     Admission of Informants' Testimony

**¶42**        Forde argues that the trial court violated Arizona Rules of Evidence 403 and 404(b) and deprived her of due process by denying her motion in limine to preclude R.W. and R.C. from testifying about the Colorado meeting. According to Forde, evidence of the meeting was improper "other act" evidence and any probative value was substantially outweighed by a danger of unfair prejudice. We review the court's ruling for an abuse of discretion. *State v. McGill*, 213 Ariz. 147, 156 ¶ 40, 140 P.3d 930, 939 (2006).

**¶43**        During the Colorado meeting, Forde related her plan to raid a house in Arivaca in September to steal weapons, drugs, and money. She said she had the house under surveillance and asked those present to join the raid. Forde later called R.C. and asked if he could be ready to assist immediately.

**¶44** The meeting demonstrated Forde's preparation and plan for the crimes and was therefore admissible under Rule 404(b), Ariz. R. Evid. And the court properly rejected Forde's Rule 403 argument because evidence of the meeting did not "suggest decision on an improper basis, such as emotion, sympathy, or horror" and did not give rise to any undue prejudice. *State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993).

### H. Destruction of Evidence

**¶45** During the Colorado meeting, Forde drew a rudimentary map of Arivaca to illustrate the locations of houses, roads, and the United States-Mexico border. R.C. gave the drawing to the FBI, which later destroyed it. Forde argues that the trial court violated her state and federal constitutional rights by failing to preclude evidence of the Colorado meeting because the FBI destroyed the drawing. Because Forde raises this issue for the first time on appeal, we review for fundamental error.[4] *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

**¶46** Law enforcement deprives a defendant of due process by destroying evidence only if (1) the exculpatory nature of the evidence was apparent before destruction, and the defendant cannot obtain comparable evidence through reasonably available means, or (2) the potential usefulness of the evidence is unknown but the state acted in bad faith by destroying it. *State v. Lehr*, 227 Ariz. 140, 150 ¶¶ 40–41, 254 P.3d 379, 389 (2011). Forde has not established either of these bases for relief.

**¶47** Forde contends that the map was exculpatory because "it would have demonstrated her intended target was not a family home, but rather a stash house." Because R.C. testified that Forde was not targeting a house occupied by a family, Forde was able to present that information to the jury. And both R.W. and FBI Agent Chris Anderson, who later saw the drawing, testified that it was meaningless standing alone. Thus, at most, the drawing was only potentially useful and not clearly exculpatory.

**¶48** Forde argues that the FBI acted in bad faith because the destruction occurred after the murders "when it was obvious the map had evidentiary value." The record, however, demonstrates only that the FBI

---

[4] Forde incorrectly argues that she preserved this issue in her motion in limine to preclude evidence of the Colorado meeting.

acted negligently. Upon receiving the drawing from R.C., Agent Anderson put it "into a chain of custody" in the FBI's Denver division. After the Pima County Sheriff's Department assumed responsibility for the investigation, the FBI transferred the drawing and other evidence to its Phoenix division. The FBI later mistakenly closed the case and destroyed the evidence. Nothing indicates that the FBI sought to deprive Forde of the drawing, and the trial court therefore did not err by refusing to preclude all evidence of the Colorado meeting. *Cf. State v. Vickers*, 180 Ariz. 521, 528, 885 P.2d 1086, 1093 (1994) (holding that state's inadvertent or negligent destruction of evidence did not violate defendant's due process rights).

**¶49** Forde also argues that the trial court erred in failing to give a *Willits*[5] instruction concerning the FBI's destruction of the map. Because Forde did not request this instruction, we review for fundamental error.

**¶50** A court must give a *Willits* instruction if the defendant shows "(1) that the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him, and (2) that this failure resulted in prejudice." *State v. Speer*, 221 Ariz. 449, 457 ¶ 40, 212 P.3d 787, 795 (2009) (citation and internal quotation marks omitted). Because Forde has not established that the drawing had a tendency to exonerate her, a *Willit*s instruction was unnecessary.

## I. Waiver of Presence at Pretrial Proceedings

**¶51** Forde argues that the trial court violated her federal and state constitutional rights to be present at trial by accepting her counsel's waiver of her presence at almost every pretrial hearing without evidence that these waivers were knowing, voluntary, and intelligent. Because Forde did not raise this issue to the trial court, we review for fundamental error.

**¶52** A defendant has a Sixth Amendment right to attend pretrial proceedings critical to the outcome of the criminal proceeding whenever the defendant's presence "would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). But defense counsel can waive this right on the defendant's behalf and, absent

---

5        *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

exceptional circumstances, the waiver is binding. *State v. Rose*, 231 Ariz. 500, 504 ¶¶ 9–10, 297 P.3d 906, 910 (2013). Forde has not alleged any exceptional circumstances that call into question the validity of her waivers. The trial court did not err by conducting the pretrial proceedings outside Forde's presence after her attorney waived her presence.

## II. GUILT PHASE

### A. Jury Selection

#### 1. Large-Group Voir Dire

¶53 After prospective jurors answered written questions, the trial court conducted voir dire in four sequestered groups of twenty-five. Forde argues that the court violated her rights to due process, a fair trial, an impartial jury, and to be free from cruel and unusual punishment by refusing to question prospective jurors individually or in sequestered groups of five. We review for an abuse of discretion. *State v. Lynch*, 225 Ariz. 27, 34 ¶ 22, 234 P.3d 595, 602 (2010).

¶54 The trial court has discretion to conduct voir dire individually "when the prospective juror might be embarrassed to confess his true opinion before an audience or when one juror's statements concerning the case might color the entire jury's outlook." Ariz. R. Crim. P. 18.5(d), cmt. Such questioning is "most useful in cases involving massive publicity or unusually sensitive subjects," *Bible*, 175 Ariz. at 570, 858 P.2d at 1173 (citation and internal quotation marks omitted), but is not required in every capital case, *Lynch*, 225 Ariz. at 34 ¶ 23, 234 P.3d at 602.

¶55 Forde argues that large-group voir dire impeded selection of an impartial jury because jurors could have been uncomfortable answering sensitive questions such as whether they had been crime victims. But such general questions are not so unusually sensitive that private questioning is required. Additionally, the court took steps to ensure that jurors would not be asked to reveal sensitive personal information publically. The written questionnaire addressed topics that could have embarrassed a juror if raised in a group setting, and it asked whether the juror wished to discuss anything privately. During voir dire, the court called five jurors to the bench to discuss personal information outside the hearing of other prospective jurors.

**¶56** Forde also asserts that the pretrial publicity in her case, together with the Giffords shootings, required individual or small-group voir dire so jurors would answer questions candidly. We disagree. The written questionnaires extensively addressed news coverage of both cases, allowing jurors to privately answer questions about the effect of pretrial publicity. Forde does not point to any answers that triggered a need for individual or small-group voir dire. Indeed, thirteen of the sixteen members of the jury panel wrote they either had no exposure or very little exposure to news coverage of this case.

**¶57** Although the court could have exercised its discretion to conduct individual or small-group voir dire, it did not abuse its discretion by not doing so.

## 2.    Scope of Questioning

**¶58** The trial court prohibited Forde from asking prospective jurors both to identify mitigation they would consider sufficient to call for leniency and to opine on whether specific circumstances would constitute such mitigation. The court reasoned it would be improper to effectively ask jurors to pre-commit to whether specific facts constitute mitigation. Forde argues that the court violated her rights to due process, to effective assistance of counsel, to an impartial jury, and to be free from cruel and unusual punishment by limiting her inquiry. Consistent with our past decisions, we reject Forde's arguments. *Moore*, 222 Ariz. at 19 ¶ 105, 213 P.3d at 168.

**¶59** Forde further asserts that the trial court erred by disallowing two questions posed to Juror 163 seeking to probe his opinion that the death penalty should be imposed in "egregious" cases. Even if the trial court committed error, however, it was harmless because Juror 163 was not seated. *See id.* at 19 ¶ 100, 213 P.3d at 168 (finding any error in voir dire of prospective jurors harmless because they either were not empanelled or served as alternates and did not deliberate). We also reject Forde's contention that harmless-error review does not apply because the court's ruling impeded her ability to ask similar questions of other prospective jurors. Forde neither made a continuing objection to the court's disallowance of such questions nor offered a list of questions she was precluded from asking.

### 3. Failure to Strike Jurors 2 and 3

¶60 Forde asserts that Jurors 2 and 3 stated they would not hold the State to its burden of proof, and the trial court therefore committed fundamental error by failing to excuse them from the panel. We disagree. The jurors' statements during voir dire did not reflect an unwillingness to hold the State to its burden of proof. And the entire prospective jury panel, including Jurors 2 and 3, later indicated they would require the State to prove the charges beyond a reasonable doubt.

### B. DNA Evidence

¶61 A silver ring belonging to Gina that was stolen during the home invasion was found in Forde's purse at the time of her arrest. Scott Walton, a DNA analyst from a private lab, testified that a partial DNA profile generated from the ring matched Forde's DNA profile. He also related statistical weights reflecting the prevalence of the profile in various racial populations.

¶62 Forde argues that the trial court erred by permitting Walton's testimony because it was irrelevant and violated her Confrontation Clause rights. Because Forde raises these issues for the first time on appeal, we review for fundamental error.

### 1. Relevance

¶63 Walton testified he would expect to find the same partial DNA profile generated from the ring in 1 in 2000 Caucasians, 1 in 1290 African-Americans, and 1 in 791 Hispanics. Walton explained he would be confident of the accuracy of a match if the profile would be expected in only 1 in 280 billion people. Forde argues that because Walton assigned a relatively low statistical weight to the DNA profile, the evidence was unreliable and therefore irrelevant, and the trial court erred by admitting it.

¶64 The DNA evidence was relevant because it tended to make a fact of consequence in the case "more or less probable than it would be without the evidence." Ariz. R. Evid. 401. Although Walton could not say that the DNA generated from the ring came from Forde, the evidence increased the probability that Forde had handled the ring and was

18

involved in the home invasion. It was the jury's prerogative to assess the weight of this evidence.

## 2. Confrontation Clause Rights

¶65 The Sixth Amendment prohibits a court from admitting testimonial hearsay statements made by a non-testifying witness unless that person is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *State v. Gomez*, 226 Ariz. 165, 244 P.3d 1163 (2010), we addressed *Crawford* and its progeny in the context of DNA testing. There, a DNA analyst testified that several profiles generated by non-testifying technicians matched the defendant's profile. *Id.* at 166 ¶¶ 3–5, 244 P.3d at 1164. We held that the Sixth Amendment is not violated so long as the testifying expert refrains from serving as a conduit for another's opinion. *Id.* at 169–70 ¶ 22, 244 P.3d at 1167–68. Because the analyst in *Gomez* did not act as a conduit for the opinions of the technicians, relied on the type of information reasonably relied upon by expert analysts, formed her own opinions, and was subject to cross-examination, the Court held that the defendant's confrontation rights were not violated. *Id.* at 170 ¶¶ 23–24, 244 P.3d at 1168; *see also State v. Snelling*, 225 Ariz. 182, 187 ¶ 20, 236 P.3d 409, 414 (2010) (finding no Sixth Amendment violation when a testifying medical examiner offered opinions about cause of death based on review of photographs of the victim and autopsy report prepared by another pathologist).

¶66 Unlike the situation in *Gomez*, it is unclear whether Walton testified about his own opinions or simply relayed those of a fellow analyst, Emily Jeskie. Jeskie performed "the DNA work" on the ring and other evidence, and Walton said he was familiar with her results and would testify about them. Later, however, he referred to himself as the person who matched the ring's partial profile to Forde's profile and assigned the statistical weights. But even assuming Walton merely relayed Jeskie's expert opinions, thereby depriving Forde of her confrontation rights, Forde has not demonstrated fundamental error or prejudice. Even without the DNA evidence, Forde was linked to the ring as it was found in her purse, which she possessed at the time of her arrest. Thus, it is unlikely the jury would have reached a different conclusion absent the DNA evidence.

### C. Eyewitness Identification Expert/Prosecutorial Misconduct

**¶67** The trial court precluded Dr. Geoffrey Loftus, an expert on memory and perception, from offering a specific opinion about the reliability of Gina's identification of Forde, although it permitted him to testify about factors affecting the accuracy of eyewitness identification. The court later sustained the State's objection to Forde's hypothetical question that matched the circumstances surrounding Gina's identification of Forde. Forde argues that the court violated her rights to due process, to present a defense, and to confront witnesses by restricting Dr. Loftus's testimony. We review the court's ruling for an abuse of discretion. *State v. Chapple*, 135 Ariz. 281, 297, 660 P.2d 1208, 1224 (1983).

**¶68** The court appropriately restricted Dr. Loftus's testimony. We have repeatedly held that while an expert may educate a jury by testifying about behavioral characteristics affecting the accuracy of eyewitness identification, the expert may not usurp the jury's role by offering opinions concerning the accuracy, reliability, or credibility of a particular witness. *See State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986); *Chapple*, 135 Ariz. at 297, 660 P.2d at 1224. This principle holds even if an expert offers an opinion about a particular witness under the guise of a hypothetical situation. *See Lindsey*, 149 Ariz. at 475, 720 P.2d at 76 (precluding expert from giving "opinions with respect to the accuracy, reliability or truthfulness of witnesses of the type under consideration").

**¶69** Forde additionally asserts that the prosecutor took unfair advantage of the court's ruling and committed misconduct by asking Dr. Loftus whether he could relate how the principles of eyewitness identification applied in this case and by later vouching for Gina's credibility. Because Forde did not object at trial, we review for fundamental error.

**¶70** Dr. Loftus testified on direct examination that a victim of an attack involving one armed and two unarmed assailants would focus on the assailant brandishing the gun. On cross-examination, the prosecutor asked a series of questions designed to elicit Dr. Loftus's admission that he could not be positive how a victim in this circumstance would react. Because these questions did not insinuate that Dr. Loftus held no opinion about Gina's identification of Forde, the prosecutor did not take unfair

advantage of the court's ruling and did not commit misconduct. *See State v. Payne*, 674 Ariz. Adv. Rep. 5 ¶ 116 (Nov. 21, 2013) (alterations in original) ("Counsel's '[s]uggestion by question or innuendo of unfavorable matter which is not in evidence and which would be irrelevant, or for which no proof exists[,] is improper and can constitute misconduct'"); *State v. Hughes*, 193 Ariz. 72, 85 ¶ 59, 969 P.2d 1184, 1197 (1998) ("Counsel's questioning and argument, however, cannot make insinuations that are not supported by the evidence."). The prosecutor fairly tested the limits of Dr. Loftus's opinion, and the trial court did not err by permitting these questions.

**¶71**        During closing argument, the prosecutor addressed the credibility of Gina's identification of Forde as follows:

> What mother would not want to sit up on the stand after you have heard the police had arrested a woman accused of murdering your daughter and say, absolutely that is the woman.

> But she didn't do that. What she told you was, and I submit to you honestly, was, no, I just can't tell you, I don't know her. I think those were Gina's words. I don't know her. I can't tell you that's the same person, but she looks just like that person.

Forde argues that by using the phrase, "I submit to you honestly," the prosecutor improperly vouched for Gina by placing the prestige of the State behind her. *See State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989) (holding that a prosecutor commits improper vouching by placing the prestige of the government behind a witness).

**¶72**        We agree with Forde that the prosecutor improperly vouched for Gina by conveying his personal belief that she had testified honestly. *See State v. Lamar*, 205 Ariz. 431, 441 ¶ 54, 72 P.3d 831, 841 (2003). But the misconduct did not result in fundamental error. Gina's honesty was not disputed by Forde. Rather, Forde sought to discredit Gina's identification testimony by challenging her memory and perception of events. Indeed, Forde sought to bolster Gina's credibility during closing argument:

> Gina [] says no, it is not her.  She is our best witness for the
> defense.  She doesn't like hearing that, I wouldn't like it if I
> were in her position; but she is our best witness.  Close in
> time, her perceptions, her memories have yet to be changed.
> Yet to be interfered with.  Close in time, it was a brown-
> haired woman that was in that home.  And at that time [it
> was] uncontradicted [that] Shawna Forde was a bright
> blond[e].

Thus, the prosecutor's vouching did not strike at the foundation of the case or adversely impact Forde's defense.  Finally, any taint from the vouching was minimized by the court's instruction that nothing said by the lawyers during closing arguments could be considered evidence.  *See Payne*, 674 Ariz. Adv. Rep. 5 ¶ 109.

### D.      Admissibility of Text Message

**¶73**        Forde argues that the trial court erred by admitting into evidence a text message, sent less than one hour after the murders from Gaxiola's phone to Forde's phone, which stated:  "cops on scene, lay low."

### 1.       Authentication

**¶74**        Forde first asserts that the State failed to authenticate the text message because insufficient evidence showed it was intended for her.  To authenticate an item of evidence, the "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   Ariz. R. Evid. 901(a).   We review the court's ruling on authentication for an abuse of discretion.  *State v. Lavers*, 168 Ariz. 376, 386, 814 P.2d 333, 343 (1991).

**¶75**        The State introduced sufficient evidence authenticating the message as one intended for Forde.  A detective testified that the cell phone from which the message was sent was registered to Gaxiola and seized from him by the sheriff's office.  The detective examined the phone's contents and noted several communications near the time of the murders to a cell phone number attributed to "White" in the phone's address book; the detective then learned from the cell phone provider that Forde was the registered subscriber for the phone number listed for

"White." When arrested, Forde had a cell phone with that same phone number.

**¶76** The evidence permitted the jury to reasonably conclude that the text message from Gaxiola's phone was intended for Forde. Consequently, the trial court did not abuse its discretion in finding that the State had authenticated the message.

### 2. Hearsay

**¶77** Forde next contends that the text message constituted inadmissible hearsay because it was admitted for the truth of the matter asserted and was not otherwise admissible as a statement of a co-conspirator. We review the trial court's application of the hearsay rule for an abuse of discretion. *State v. Tucker*, 205 Ariz. 157, 165 ¶ 41, 68 P.3d 110, 118 (2003).

**¶78** The text message was not hearsay because the State did not introduce it to prove the truth of the matter asserted — that the cops were on the scene. *See* Ariz. R. Evid. 801(c) (defining hearsay). Rather, the State introduced the message to show that Gaxiola was communicating concerns about police activity at the victims' home to someone he thought would share his concerns, thereby constituting circumstantial evidence of the other person's involvement. Because the text message was not hearsay, we need not decide whether the message was admissible as a statement of a co-conspirator.

### 3. Confrontation Clause

**¶79** Forde also argues that admission of the text message violated her Sixth Amendment Confrontation Clause rights because the message was used as evidence of her guilt. We review Confrontation Clause challenges de novo. *Snelling*, 225 Ariz. at 187 ¶ 18, 236 P.3d at 414.

**¶80** The Confrontation Clause prohibits the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. As Forde concedes, the message was not testimonial. "Testimony" means "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51. The text message reflected

Gaxiola's intent to warn Forde of police activity; it did not seek to establish or prove a fact. *Cf. State v. Damper*, 223 Ariz. 572, 575–76 ¶ 12, 225 P.3d 1148, 1151–52 (App. 2010) (holding that text message from victim before murder asking friend to come over and advising that she and defendant had been fighting was not testimonial because "[nothing] suggests [victim] intended or believed it might later be used in a prosecution or at a trial"). The court did not violate Forde's Confrontation Clause rights by admitting the text message.

### E.    Jury Instructions

#### 1.    Felony Murder

¶81    The trial court instructed the jury that first degree murder

> requires proof that the defendant, acting either alone or with one or more other persons, committed or attempted to commit burglary or robbery or both and, in the course of and in furtherance of the offense or immediate flight from the offense, the defendant or another person caused the death of another person.

The court then instructed the jury on the elements of burglary, armed robbery, and aggravated robbery. Notably, the court instructed that Forde committed first degree burglary if, among other things, she "[e]ntered or remained unlawfully in or on a residential structure" with the intent "to commit any theft or felony therein." Forde contends that the court violated her due process rights because it did not define "theft" or "felony." Because Forde did not raise this issue to the trial court, we review for fundamental error.

¶82    The trial court did not err by failing to define "theft" for the jury. A trial court need not "define every phrase or word used in the [jury] instructions, especially when they are used in their ordinary sense and are commonly understood." *State v. Eastlack*, 180 Ariz. 243, 259, 883 P.2d 999, 1015 (1994). In *State v. Belyeu*, the court of appeals held it was not fundamental error for the trial court to fail to define "theft" as used in a burglary instruction. 164 Ariz. 586, 589–90, 795 P.2d 229, 232–33 (App. 1990). Other courts have reached the same conclusion. *See, e.g., Ex parte*

*Hagood*, 777 So. 2d 214, 220 (Ala. 1999); *State v. Ng*, 750 P.2d 632, 639 (Wash. 1988).  We agree.

**¶83**        This Court's decision in *State v. Schad*, 142 Ariz. 619, 691 P.2d 710 (1984), is inapposite.  In *Schad*, we held that the trial court had erred by giving a felony murder instruction that listed several felonies without defining their elements.  *Id*. at 620, 691 P.2d at 711.  We noted that "[k]nowledge of the elements of the underlying felonies was vital for the jurors to properly consider a felony murder theory."  *Id*. at 620–21, 691 P.2d at 711–12.  The court here defined the elements of every charged felony, including burglary.

**¶84**        We also reject Forde's contention that the trial court erred by failing to define "felony" for the jury.  Forde relies on *People v. Failla*, 414 P.2d 39, 41 (Cal. 1966), in which a trial court instructed the jury that a person commits burglary by entering an apartment with intent to commit theft "or any felony" therein.  The California Supreme Court reversed, pointing out that evidence also suggested that the defendant intended to commit one or more misdemeanors when he entered apartments, and the court could not assume that the jury understood the "refined statutory distinctions" between felonies and misdemeanors.  *Id*. at 42.  In contrast, no evidence permitted an inference that Forde or an accomplice unlawfully entered or remained at the victims' home with the intent to commit a misdemeanor.  And the trial court here instructed the jury on the elements of all felonies charged against Forde.  *See id.* at 41 (agreeing with decision of another court that no error occurred in failing to define "felony" when court defined rape and murder, the only felonies with which defendant was charged).

**¶85**        Forde finally argues that the failure to define "felony" violated the merger doctrine by erroneously permitting the jury to convict her of first degree murder if she or Bush entered the home with the intent to assault or kill the victims.  We have repeatedly rejected this argument, *see State v. Kuhs*, 223 Ariz. 376, 382 ¶ 23 n.4, 224 P.3d 192, 198 n.4 (2010), and Forde offers no reasons to reconsider these decisions.

### 2. *Portillo* Instruction

¶86 The trial court instructed the jury that the State bore the burden of proving Forde's guilt beyond a reasonable doubt, but it also explained the burden in simpler terms:

> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find the defendant guilty. If, on the other hand, you think there is a real possibility that the defendant is not guilty, you must give her the benefit of the doubt and find her not guilty.

Forde contends that the phrases "firmly convinced" and "real possibility" in the instructions unconstitutionally permitted the jury to apply a lower standard of proof than "beyond a reasonable doubt." We approved these instructions in *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), and have repeatedly rejected challenges to them, *see, e.g., State v. Dann (Dann III)*, 220 Ariz. 351, 366 ¶ 65, 207 P.3d 604, 618 (2009).

## III. AGGRAVATION PHASE

### A. *Enmund/Tison* Findings

¶87 A defendant convicted of felony murder is eligible for the death penalty only if the state proves he "himself kill[s], attempt[s] to kill, or intend[s] that a killing take place or that lethal force will be employed," *Enmund v. Florida*, 458 U.S. 782, 797 (1982), or is a major participant in a felony and acts "with reckless indifference to human life," *Tison v. Arizona*, 481 U.S. 137, 158 (1987). In separate verdict forms concerning each murder, the jury found that Forde "intended that the killing take place," and that she "was a major participant in the robbery or burglary *and* was recklessly indifferent regarding a person's life." Forde raises several challenges to the jury's verdicts, which we address in turn.

### 1. Consideration with Aggravating Circumstances

¶88 Consistent with A.R.S. § 13-752(P), the jury made its *Enmund/Tison* findings in the aggravation phase. Forde argues that Eighth Amendment narrowing and proportionality principles required the jury

26

to make the *Enmund/Tison* findings before it considered aggravating circumstances. She asserts that bifurcation or a guiding instruction was required here because nothing prevented the jury from either (1) deciding that the crimes were aggravated and then using that decision to find Forde death-eligible under *Enmund/Tison*, or (2) using the *Enmund/Tison* finding or evidence supporting it as a non-statutory aggravator. Because Forde did not raise this issue at trial, we review for fundamental error.

¶89 No statute or case requires a jury to make the *Enmund/Tison* findings before deciding the existence of aggravating circumstances. *See* A.R.S. § 13-752(C), (P) (requiring jury to address both issues in aggravation phase); *Cabana v. Bullock,* 474 U.S. 376, 386 (1986), *abrogated on other grounds by Pope v. Illinois,* 481 U.S. 497 (1987) ("At what precise point in its criminal process a State chooses to make the *Enmund* determination is of little concern from the standpoint of the Constitution."). Moreover, simultaneous consideration of the *Enmund/Tison* and aggravating circumstances issues did not invite impermissible findings. The aggravation phase consisted solely of argument by counsel and instruction by the court; no evidence was presented. Thus, no risk existed that the jury would hear new evidence applicable only to one issue to decide the other. And nothing reflects that the jury was confused about having to make independent *Enmund/Tison* and aggravation inquiries. The court instructed the jury that Forde would be eligible for the death penalty only if the State proved both that Forde met the *Enmund/Tison* threshold and that at least one aggravating circumstance existed. The court also provided separate verdict forms for the *Enmund/Tison* findings and the existence of aggravating circumstances.

### 2. Jury Instruction

#### a. Requested Narrowing Instruction

¶90 Forde argues that the trial court violated Eighth Amendment proportionality and narrowing principles by refusing to instruct the jury as follows: "Every felony that occurs as part of a felony murder brings with it danger and risk of serious injury or death to potential victims of the listed felony. To find 'reckless indifference' to human life, something more is required." We review for an abuse of discretion. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995).

¶91        Although a party is entitled to an instruction on all theories reasonably supported by the evidence, "when a jury is properly instructed on the applicable law, the trial court is not required to provide additional instructions that do nothing more than reiterate or enlarge the instructions in defendant's language." *Id*. Here, the court instructed that "something more" than commission of a felony is required to constitute "reckless indifference" by telling the jury that "a finding of reckless indifference cannot be based solely upon a finding that the defendant . . . merely participated in a crime resulting in a homicide." Because Forde's proposed instruction did nothing more than reiterate the given instruction, the trial court did not abuse its discretion by not giving the instruction.

### b.        Confusion About Threshold

¶92        Forde next argues that because the *Enmund/Tison* instruction began with the phrase, "[b]efore determining whether the defendant should be sentenced to life imprisonment or death, you must determine whether the State has proved, beyond a reasonable doubt, [the *Enmund/Tison* threshold]," the court improperly told the jury it could impose a death sentence even if that threshold was unmet. Because Forde did not object at trial, we review for fundamental error, which Forde has not shown here. In another instruction, the court explicitly told the jury that if the State did not prove that Forde met the *Enmund/Tison* threshold, the court would impose a life sentence. Thus, any confusion stemming from the introductory language in the *Enmund/Tison* instruction was eliminated. *See Dann III*, 220 Ariz. at 363 ¶ 51, 207 P.3d at 617.

### c.        Use of the Finding

¶93        Forde also contends that the trial court committed fundamental error by failing to instruct the jury that an *Enmund/Tison* finding cannot serve as an aggravating circumstance. The court instructed the jury that the State had alleged four statutory aggravators, none of which duplicated or overlapped with an *Enmund/Tison* finding. The verdict form likewise listed only the statutory aggravators. The trial court did not err by failing to explicitly instruct the jury that an *Enmund/Tison* finding cannot constitute an aggravating circumstance. *See Dann III*, 220 Ariz. at 363 ¶ 51, 207 P.3d at 617.

### d.    Culpable Mental State

¶94        Forde argues that the trial court's instruction on "reckless indifference" erroneously communicated objective standards that eliminated the State's burden to prove she acted with a subjective mental state.  Because Forde did not object to the instruction, we review for fundamental error.

¶95        The court instructed the jury as follows:

> A defendant acts with reckless indifference to human life when that defendant knowingly engages in criminal activities known to carry a grave risk of death to another human being.  The risk must be of such nature and degree that the conscious disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

¶96        This instruction required proof of a subjective mental state in its direction to the jurors to find that this defendant knowingly engaged in criminal activities carrying a grave risk of death to another person.  The court's use of objective language to describe the type of "criminal activities" and "risk" underlying reckless indifference did not eliminate the State's burden to prove Forde's subjective mental state.  Indeed, the instruction is based on language from *Tison* and the statutory definition of "recklessly."  481 U.S. at 157–58 ("[T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment . . . ."); A.R.S. § 13-105(10)(c) (using objective language to describe a disregarded "risk").  The trial court did not commit error.

### 3.    Sufficiency of the Evidence

¶97        Forde argues that the evidence was insufficient to support the jury's *Enmund/Tison* findings.  "Substantial evidence exists when there is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt."  *Garcia*, 224 Ariz. at 15 ¶ 54, 226 P.3d at 384 (citation and internal quotation marks omitted).

¶98　　　　The evidence amply supports the jury's findings that Forde was a major participant in the burglary or robbery. She planned to rob the Arivaca house, scouted the house the day of the shootings, took the lead in entering the house, directed other participants, and took jewelry from Gina's bedroom. Forde notes that no physical evidence links her to the scene, and she challenges the reliability of Gina's identification and Oakstar's testimony about her participation in events. But the jury was free to credit that testimony and weigh all the other evidence. *See State v. Soto-Fong*, 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996). Because Forde actively planned and executed the burglary and robbery, which culminated in the murders, she was a major participant in these predicate crimes. *See State v. Bearup*, 221 Ariz. 163, 170–71 ¶¶ 34–35, 211 P.3d 684, 691–92 (2009) (concluding that a defendant who held a knife and encircled victim with others was a major participant in kidnapping that ended with victim's murder).

¶99　　　　The record also reveals substantial evidence that Forde acted with reckless indifference to human life. *Tison*, 481 U.S. at 157–58. She planned the home invasion with Gaxiola and Oakstar knowing they wanted to kill Flores because they believed that he competed with their drug operation. She led a late-night home invasion with armed men, including Gaxiola, and barged into the victims' home, threatening violence. Even if Forde intended only to rob the victims, doing so by invading their home at night with armed men — at least one of whom was motivated to kill Flores — demonstrated Forde's awareness that her criminal activities carried a grave risk of death to others. *See id.*; *cf. State v. Robinson*, 165 Ariz. 51, 62, 796 P.2d 853, 864 (1990) (holding that defendant's presence when victims were tied during home robbery, terrorized with firearms, and then shot was sufficient to demonstrate reckless indifference even though defendant did not actually kill).

¶100　　　　Additionally, after Bush killed Flores and shot Gina, Forde did nothing to stop Bush from shooting Brisenia. Instead, Forde left the child with armed men and went to search the bedroom. And after re-entering the house and discovering that Gina was still alive, Forde shouted for someone to "finish [her] off." These circumstances further support the jury's finding that Forde acted with reckless indifference to human life.

¶101        In sum, substantial evidence supports the jury's finding that Forde was a major participant in the burglary or robbery and acted with reckless indifference for the murder victims' lives. Because this finding meets the *Enmund/Tison* threshold, we need not address whether substantial evidence supports the jury's additional finding that Forde intended that the killings take place.

## B.      Denial of Motion for Mistrial

¶102        Forde asserts that, in closing argument, the prosecutor committed misconduct by suggesting that she was "armed to the teeth" during the invasion. The prosecutor made the following statements:

> And then as she gets closer in time and recruits these folks and gets Mr. Bush down there and they go to the house armed with AK-47's and a .45 caliber handgun, you go into somebody's house under this false pretense at 1:00 in the morning, armed to the teeth, I would submit to you that that shows a reckless indifference to human life[;] not only is she a major participant in the organization of this but she is demonstrating by her actions, how she's armed, telling people what to do, barking orders, in the middle of the night in someone else's home armed with these weapons, she has demonstrated a reckless indifference to human life.

At the conclusion of the prosecutor's argument, Forde moved for a mistrial. The trial court denied the motion, stating Forde would "have an opportunity to address those things to the jury."

¶103        We review a trial court's decision to deny a motion for mistrial based on prosecutorial misconduct for an abuse of discretion. *State v. Newell*, 212 Ariz. 389, 402 ¶ 61, 132 P.3d 833, 846 (2006). We will reverse if (1) the prosecutor's statements constituted misconduct, and (2) a reasonable likelihood exists that those statements could have affected the jury's verdict. *See State v. Gallardo*, 225 Ariz. 560, 568 ¶ 34, 242 P.3d 159, 167 (2010).

¶104        The prosecutor improperly stated that Forde was armed during the home invasion; no evidence supported this assertion. *See State v. Woods*, 141 Ariz. 446, 455, 687 P.2d 1201, 1210 (1984). But these

statements did not so infect the proceedings with unfairness as to deny Forde due process. Forde addressed the prosecutor's "armed to the teeth" argument during her closing argument and reminded the jury that no evidence showed she had been armed; the prosecutor did not dispute this characterization during his rebuttal closing argument. Finally, the trial court lessened the impact of the prosecutor's misstatement by instructing the jury that the lawyers' arguments were not evidence. *See Payne*, 674 Ariz. Adv. Rep. 5 ¶ 109. The trial court did not abuse its discretion in denying Forde's motion for mistrial based on prosecutorial misconduct.

## C.    Constitutionality of the (F)(2) Aggravator

**¶105**        A defendant's prior conviction for a "serious offense" constitutes an aggravating circumstance under A.R.S. § 13-751(F)(2). In 2003, the legislature amended a prior version of § 13-751(F)(2) to explicitly provide that a serious offense committed contemporaneously with the murder satisfies this statutory aggravating circumstance. *See State v. Rutledge*, 206 Ariz. 172, 176 ¶ 17 n.3, 76 P.3d 443, 447 n.3 (2003). Forde argues that the (F)(2) aggravator violates the Eighth Amendment by failing to genuinely narrow the class of death-eligible defendants because several offenses fall within the definition of "serious offenses" and the aggravator applies to convictions for offenses committed contemporaneously with the murder. *See* A.R.S. § 13-751(J) (enumerating "serious offenses"). We review the constitutionality of statutory aggravating circumstances de novo. *State v. Hargrave*, 225 Ariz. 1, 13 ¶ 42, 234 P.3d 569, 581 (2010).

**¶106**        The Eighth Amendment requires a death penalty sentencing scheme to "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Aggravating circumstances serve this narrowing function by channeling and limiting the sentencer's discretion, thereby minimizing "the risk of wholly arbitrary and capricious action." *State v. Nelson*, 229 Ariz. 180, 186 ¶ 26, 273 P.3d 632, 638 (2012) (citation and internal quotation marks omitted). To be valid, an aggravator must neither apply to every convicted murderer nor be unconstitutionally vague. *Id*.

**¶107** The (F)(2) aggravator does not violate the Eighth Amendment. Section 13-751(J) lists twelve offenses that constitute "serious offenses" along with "[a]ny dangerous crime against children," which applies to twenty-one additional offenses. A.R.S. § 13-705(P)(1). Consequently, the aggravator appropriately channels and limits the sentencer's discretion by explicitly identifying which offenses qualify as "serious offenses." *See Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (approving "clear and objective standards that provide specific and detailed guidance") (citation and internal quotation marks omitted).

**¶108** Forde's reliance on *Rutledge* is misplaced. There, we approved a trial court's ruling that the pre-2003 version of the (F)(2) aggravator did not apply to offenses committed contemporaneously with the murder for a number of reasons, including that a contrary interpretation "would broaden the class of death eligible defendants, contrary to the legislative intent to narrow that class of persons." *Rutledge*, 206 Ariz. at 176 ¶ 17, 76 P.3d at 447. Contrary to Forde's implicit assertion, however, neither the trial court nor this Court in *Rutledge* decided that permitting use of convictions for contemporaneously committed offenses would be unconstitutionally overbroad.

## D. Constitutionality of the (F)(9) Aggravator

**¶109** The (F)(9) aggravator applies when "[t]he defendant was an adult at the time the offense was committed or was tried as an adult and the murdered person was under fifteen years of age . . . ." A.R.S. § 13-751(F)(9). Forde argues that the aggravator as applied here violates Eighth Amendment narrowing principles by focusing only on Brisenia's age rather than whether Forde targeted Brisenia due to her age.

**¶110** We have previously held that the (F)(9) aggravator sufficiently narrows the class of offenders eligible for the death penalty, and nothing here compels us to reach a different result. *See Nelson*, 229 Ariz. at 186–87 ¶¶ 26–27, 273 P.3d at 638–39. Regardless whether Forde targeted Brisenia because of her age, by acting as a major participant in the home invasion and manifesting reckless indifference to a young child's life, Forde demonstrated she falls within a narrow class of offenders who pose a heightened danger to society. *See State v. Smith*, 193 Ariz. 452, 462 ¶ 48, 974 P.2d 431, 441 (1999) ("[T]he age of the victim is relevant to an inquiry into the defendant's characteristics and

propensities. Those who prey on the very young or the very old are more dangerous to society.").

### E. Oral Jury Instruction

¶111 When instructing the jury, the trial court mistakenly said that if the jury finds that an aggravating circumstance exists but decides life imprisonment is appropriate, the court would "sentence the defendant to either life imprisonment *with* the possibility of release or life imprisonment with the possibility of release after 35 years." (Emphasis added.) Forde argues that the trial court's mistake violated her due process and Eighth Amendment rights. Because Forde did not object at trial, we review for fundamental error.

¶112 The court did not commit fundamental error by saying "with" instead of "without" when reading the instructions. As the judge recited the instructions, the jury read a written copy, which correctly stated that a life sentence would be either without the possibility of release or with the possibility of release after thirty-five years. Also, the court correctly told the jury twice during the same recitation of instructions that Forde's possible sentences were death or life imprisonment either without the possibility of release or with the possibility of release after thirty-five years. Consequently, and because the contested oral instruction was redundant, the court's mistake was apparent. Moreover, if the jurors were confused by the oral instruction, they could have referred to the written instructions, which they possessed during deliberations. Finally, the verdict form used in the penalty phase stated that a life sentence would be "with or without the possibility of release." The trial court's misreading of the jury instructions did not cause fundamental, prejudicial error. *Cf. People v. Mills*, 48 Cal. 4th 158, 200 (2010) ("The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact that the trial court misspoke.").

### IV. PENALTY PHASE

### A. Victim Impact Statement

¶113 At the outset of the penalty phase, Gina gave a victim impact statement in which she noted, "It's hard for me to understand how this all

happened. I have so many questions that will remain unanswered. I just want to know why the defendant chose to exchange my husband and my daughter's life and almost my life for some such metal and inexpensive jewelry." Forde contends that this statement was an impermissible comment on the exercise of her Fifth Amendment privilege not to testify. Because she did not object at trial or move for a mistrial, we review for fundamental error.

¶114 There was no error, fundamental or otherwise. The statements expressed Gina's inability to comprehend the senselessness of the murders rather than a comment on Forde's exercise of her Fifth Amendment privilege.

## B. Rebuttal Mitigation Evidence

¶115 In the months immediately preceding the trial, Forde filed a notice of twenty mitigating factors, including "[h]istory of non-violence" and "[n]o felony record," and disclosed expert reports. Two expert reports reflected that Forde had been sexually assaulted and shot in separate incidents months before the murders. The State disclosed its intention to rebut this mitigation with evidence suggesting she had engaged in other violent criminal activities and had fabricated claims that she had been sexually assaulted and shot.

¶116 The week before the originally scheduled trial date, Forde moved to preclude the State's rebuttal evidence as irrelevant and unduly prejudicial or, alternatively, to continue the trial to permit investigation. The trial court refused to preclude any evidence at that time, reasoning that it must await the presentation of mitigation to determine the admissibility of the rebuttal mitigation evidence. The court denied the motion to continue without further comment. Forde later withdrew the "[h]istory of non-violence" and "[n]o felony record" mitigating factors, and the State did not present any evidence that Forde had sought to preclude. We review the court's rulings for an abuse of discretion. *Dixon*, 226 Ariz. at 555 ¶ 53, 250 P.3d at 1184 (motion to continue); *McGill*, 213 Ariz. at 156 ¶ 40, 140 P.3d at 939 (evidentiary rulings).

¶117 Forde argues that the trial court violated her rights to due process and individualized consideration in sentencing by failing to preclude the State's rebuttal evidence as irrelevant, unreliable, and highly

prejudicial. As a result, Forde asserts, she suffered prejudice by withdrawing the two mitigating factors rather than risking admission of the State's rebuttal evidence.

¶118 The trial court did not abuse its discretion. Admissibility of the rebuttal evidence turned on whether it was relevant to the existence of mitigation sufficiently substantial to call for leniency, A.R.S. § 13-752(G), and, if so, whether the evidence was unfairly prejudicial. *State v. Hampton*, 213 Ariz. 167, 180 ¶ 51, 140 P.3d 950, 963 (2006). The court acknowledged these limitations, stating that admissible rebuttal evidence must be reliable and relevant to the specific thrust of Forde's mitigation evidence. Because the record in the motion proceedings was not sufficient for the court to make these assessments, the court acted within its discretion by denying the motion as premature.

¶119 Similarly, the court did not err by refusing to continue the trial because extraordinary circumstances did not exist to justify a continuance at that late date, and Forde has not demonstrated prejudice. *See* Ariz. R. Crim. P. 8.5(b); *VanWinkle*, 230 Ariz. at 390 ¶ 7, 285 P.3d at 311. Forde created the tight time frame she complains about by obtaining extensions of time to disclose her mitigation evidence, knowing the State would be forced to disclose its rebuttal evidence shortly before trial. *See State v. Maxwell*, 103 Ariz. 478, 480–81, 445 P.2d 837, 839–40 (1968) (citing lack of diligence of a party as one justification for denying motion to continue trial). Additionally, Forde fails to explain why she lacked time to adequately investigate. She possessed police reports concerning two of the criminal incidents for almost two years, and her investigator had already contacted out-of-state authorities and reviewed police reports about the remaining incidents. The State had disclosed all rebuttal mitigation evidence and listed six rebuttal witnesses. Forde had an additional five weeks to interview these witnesses and otherwise investigate before commencement of the penalty phase. The trial court did not commit error.

## C. Jury Instructions

¶120 Forde challenges the jury instructions on several bases, asserting that many instructions were constitutionally flawed and that the court erred by failing to give other instructions. Because Forde neither objected to the given instructions nor asked the court to give the

additional instructions, we review for fundamental error. *See Bearup*, 221 Ariz. at 168 ¶¶ 20–21, 211 P.3d at 689.

### 1. Causal Nexus

**¶121** The court instructed the jury that it was "not required to find that there is a connection between a mitigating circumstance and the crime committed in order to consider the mitigation evidence." Forde argues that by instructing the jury it was "not required" to find a connection, the court incorrectly implied it was permissible to require a connection before considering the evidence.

**¶122** The trial court did not err. The court correctly told the jury that "mitigating circumstances may be found from any evidence," it "should consider all of the evidence," and it could consider in mitigation "anything related to the defendant's character, propensity, history or record, or circumstances of the offense." *See Eddings v. Oklahoma*, 455 U.S. 104, 110, 114 (1982) (holding that a trial court must not preclude the jury from considering any aspect of the defendant's character or circumstances as a mitigating factor). The court also said that each juror "must decide individually whether any mitigating circumstance exists." Nothing in the contested instruction suggested that the jury should refuse to consider mitigation evidence if it was unrelated to the crimes.

### 2. Discretionary Consideration of Mitigating Evidence

**¶123** The trial court instructed the jury that "[t]he circumstances proposed as mitigation by the defendant for your consideration in this case are: [seventeen listed factors]." Forde argues that using the words "proposed as" erroneously made consideration of her evidence discretionary, particularly as other instructions told the jury that it "shall consider" certain statutory mitigating factors. We disagree. The instruction appropriately described Forde's proposed mitigation and did not purport to make consideration of that evidence discretionary. Regardless, any confusion was remedied by the court's explicit instruction that the jury should "consider all the evidence."

### 3. Weighing Mitigation

**¶124** Forde contends that the trial court erroneously told the jury that in determining the appropriate sentence, it "must decide how compelling or persuasive the totality of the mitigating factors is when compared against the totality of the aggravating factors and the facts and circumstances of the case." She argues that asking the jury to make this comparison inappropriately dissuaded it from considering any circumstances of the offense as mitigation, such as the fact that she did not fire a gun. Because Forde raises this issue for the first time on appeal, we review for fundamental error, which does not exist. The court also instructed the jury that it was permitted to "consider anything related to the . . . circumstances of the offense." Nothing prevented the jury from considering any circumstances of the offense as mitigation.

### 4. Victim Impact Statement

**¶125** The trial court instructed the jury it could consider Gina's victim impact statement "to the extent that it rebuts mitigation." Forde asserts that the instruction was erroneous because Gina's statement did not rebut any mitigation evidence, and the instruction therefore permitted the jury to consider the statement as an improper non-statutory aggravator. Because Forde did not object to this instruction, we review for fundamental error.

**¶126** Victim impact evidence "rebuts" mitigation by informing the sentencer about the specific harm caused by the defendant. *Cf. Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (holding that victim impact evidence properly "remind[s] the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family") (citation and internal quotation marks omitted). The victim is not limited to addressing mitigation topics presented by the defendant, as Forde suggests. *See State v. Prince*, 226 Ariz. 516, 535 ¶ 68, 250 P.3d 1145, 1164 (2011) (rejecting argument that victim impact evidence is irrelevant in the penalty phase because it focuses on the victim rather than the defendant). Additionally, no risk existed here that the jury would consider Gina's statement as a non-statutory aggravator because the court explicitly instructed the jury that it could not consider the statement as a new

aggravating circumstance. The trial court did not commit error by giving the instruction.

### 5. Sympathy

**¶127** The trial court instructed the jury that it was "not to be swayed by mere sympathy not related to the evidence presented during the penalty phase." This Court previously approved use of this instruction. *See Kuhs*, 223 Ariz. at 387 ¶ 55, 224 P.3d at 203. But Forde raises a new challenge, arguing that the instruction incorrectly limited the jury's consideration of mitigation to evidence presented during the penalty phase. The instruction appropriately directed the jury "'to ignore only the sort of sympathy that would be totally divorced from the evidence.'" *State v. Carreon*, 210 Ariz. 54, 70 ¶ 84, 107 P.3d 900, 916 (2005) (quoting *California v. Brown*, 479 U.S. 538, 542 (1987)). Elsewhere, the court explicitly and repeatedly instructed that the jury should consider all mitigating evidence, regardless of the phase of trial during which it was presented.

**¶128** Forde also contends that the instruction improperly told the jury it could be swayed by sympathy for Gina and her family, thereby inviting the jury to rely on an improper, non-statutory aggravator. But the instruction did not mention any victim, and the court told the jury it could not consider Gina's statement to be an aggravating circumstance. For these reasons, we reject Forde's arguments.

### 6. Life Sentence

**¶129** Forde argues that the trial court shifted the burden to her to prove she was entitled to a life sentence, thereby creating a presumption of death, by failing to tell the jury it could return a life sentence even if it found that the aggravators were "of greater quality or value than the mitigation" but that the mitigation was "sufficiently substantial" to justify a life sentence. Section 13-751(E), A.R.S., requires the jury to impose a death sentence if it finds the existence of at least one statutory aggravator "and then determines that there are no mitigating circumstances sufficiently substantial to call for leniency." The court's instruction tracked this language. Additionally, the court said that even if Forde presented no mitigation evidence or jurors individually concluded that

the aggravating and mitigating circumstances had equal strength, they could vote for a life sentence. The court properly instructed the jury.

### 7. Ability to Distinguish Right from Wrong

¶130 Forde's two mental health experts testified about her intelligence, brain functioning, and mental health. Without objection, jurors asked whether Forde, or someone similarly situated, could tell the difference between right and wrong or know that killing another human being is wrong. Both experts answered that someone like Forde could distinguish right from wrong, and one added that Forde knows that some behaviors are wrong.

¶131 Forde asserts that the jurors' questions demonstrated a risk that at least some jurors would refuse to consider the mental health mitigation evidence unless it established an inability to distinguish right from wrong. Therefore, Forde argues, the trial court erred by failing to sua sponte instruct the jury that her ability to distinguish right from wrong was irrelevant.

¶132 The court did not commit error. In assessing the strength of Forde's mental health evidence, the jurors were entitled to consider whether her condition impaired her ability to perceive the wrongfulness of her behavior. *See State v. Smith*, 215 Ariz. 221, 235 ¶ 67, 159 P.3d 531, 545 (2007) (deciding that weight of defendant's mental health evidence was diminished by evidence the defendant "likely knew what he was doing and that it was wrong"). Moreover, Forde had the opportunity to make closing arguments to the jury on this point and did so.

### D. Verdict Forms

¶133 The verdict forms for each murder recited that the jury unanimously found that Forde should be sentenced to either life or death and provided a line on which to indicate the chosen option. Forde argues that the trial court erred by not providing a "not-unanimous" option on the verdict forms to guide jurors in making individual sentencing decisions. Because Forde did not object to the verdict forms, we review for fundamental error, and find none. The jury instructions stated that each juror must make an "individual assessment" about the appropriate sentence and cautioned jurors "not [to] surrender [their] honest

convictions as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict." Because the court appropriately instructed the jury that each juror must individually agree on a sentence to return a verdict, it was not necessary to provide a "not-unanimous" option on the verdict forms.

¶134 Forde also argues that the trial court erred by failing to sua sponte provide a special verdict form asking jurors to indicate which mitigating circumstances they found proven by a preponderance of the evidence. But because jurors "do not have to agree unanimously that a mitigating circumstance has been proven to exist," and "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty," A.R.S. § 13-751(C), provision of a special verdict form would have been inappropriate. *See State v. Roseberry*, 210 Ariz. 360, 373 ¶ 74 n.12, 111 P.3d 402, 415 n.12 (2005) ("There cannot be a special verdict on mitigation because the jurors need not agree that a mitigating factor has been proven to exist.").

## V.    SENTENCING

### A.    Disproportionate Sentence

¶135 Forde argues that her death sentences violate the Eighth Amendment because they are disproportionate to the life sentences later imposed on Gaxiola after his separate trial. Although sentencing disparity evidence was not before the jury because Gaxiola had not yet been sentenced when Forde's penalty phase occurred, Forde contends that we should either consider the disparity a mitigating circumstance and reduce her sentences to life imprisonment or remand for a new sentencing proceeding. We decline to do so.

¶136 This Court is required to determine whether the trier-of-fact abused its discretion in imposing a death sentence. A.R.S. § 13-756(A). Although an unexplained sentencing disparity between a defendant and an accomplice may be a mitigating circumstance, *State v. Carlson*, 202 Ariz. 570, 586 ¶ 65, 48 P.3d 1180, 1196 (2002), we cannot say the jury abused its discretion by failing to give weight to the disparity here because one did not yet exist.

### B.      Sentencing on Non-Capital Counts

### 1.      Propriety of Consecutive Sentences

¶137      Forde's prison sentence for attempted first degree murder of Gina (count four) runs consecutively to concurrent prison terms imposed for two counts of aggravated assault of Gina (counts five and six).  Her sentences for armed robbery (count seven) and aggravated robbery (count eight) also run consecutively to each other.  Forde argues that these sentences violate A.R.S. § 13-116, which prohibits consecutive sentences for offenses arising from a single act.  Because Forde did not object to the trial court, we review for fundamental error.  An illegal sentence constitutes fundamental error.  *See State v. Smith*, 219 Ariz. 132, 135–36 ¶¶ 18–20, 194 P.3d 399, 402–03 (2008).

¶138      To determine whether Forde's conduct underlying counts four through six constitutes a single act under § 13-116, we apply the test set out in *State v. Gordon*, 161 Ariz. 308, 315, 778 P.2d 1204, 1211 (1989).  Preliminarily, we isolate the elements of attempted murder, which we treat as the "ultimate crime," meaning "the [crime] that is at the essence of the factual nexus and that will often be the most serious of the charges." *See id*.  After doing so, we conclude that the remaining evidence supports her aggravated assault convictions, making her eligible for consecutive sentences notwithstanding § 13-116.  *See id.*  The attempted murder conviction was established by evidence that at the conclusion of the home invasion, Forde discovered Gina on the phone and shouted for someone to "finish [her] off," prompting Bush to re-enter the home and shoot at Gina.  *See* A.R.S. §§ 13-303, -1001(A)(1), -1105(A)(1).  The aggravated assault convictions were established by evidence that Bush shot Gina twice and seriously injured her soon after he initially entered the home. *See* A.R.S. §§ 13-303, -1203(A), -1204(A)(1) and (2).

¶139      Other considerations set forth in *Gordon* support imposition of consecutive sentences.  Because the attempted murder and aggravated assaults occurred at different times during the home invasion and involved separate acts, it was possible for Forde to commit the former crime without committing the latter ones.  Also, the aggravated assaults caused Gina to suffer physical injuries that were not inherent in the attempted murder.  *See Gordon*, 161 Ariz. at 315, 778 P.2d at 1211 (holding that a defendant more likely committed multiple acts if "the defendant's

conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime"). For all these reasons, Forde's conduct underlying the attempted murder count and the aggravated assault counts did not constitute a single act within the meaning of § 13-116, and consequently, the trial court did not err by imposing consecutive sentences.

¶140 We reach a different conclusion regarding the propriety of consecutive sentences for robbery and aggravated robbery. The State concedes that the trial court erred because these crimes were based on a single act by Forde — taking Gina's personal belongings. We agree and therefore modify the sentences on counts seven and eight to run concurrently. *See* Ariz. R. Crim. P. 31.17(b) (authorizing appellate court to modify trial court action as necessary and appropriate).

## 2. Consideration of Mitigation Evidence

¶141 Although Forde argued for the existence of seventeen mitigating circumstances, the trial court found that only her lack of prior felony convictions and her parental responsibilities served as mitigation. Forde argues that by failing to find the existence of other mitigating circumstances, the court necessarily violated A.R.S. § 13-701(E), which required it to consider mitigation evidence concerning Forde's character and background and the circumstances of the crime. But the court's failure to find other mitigating circumstances does not signal non-compliance with § 13-701(E); it simply indicates that the court did not find other evidence to be proved, or, if proved, the court did not find it sufficient to call for reduced sentences. *See State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995) ("Although the court must consider relevant evidence offered in mitigation, it is not required to find that evidence to be mitigating."). Additionally, the court stated at the time of sentencing that it had "read and considered the pre-sentence report, its recommendation and all the evidence presented at trial." The court did not commit error.

## VI. ABUSE OF DISCRETION REVIEW

¶142 Because the murders occurred after August 1, 2002, we review the propriety of Forde's death sentences for an abuse of discretion. A.R.S. § 13-756(A). The jury did not abuse its discretion if reasonable evidence supports the aggravating circumstances found and the

appropriateness of the sentences. *State v. Benson*, 232 Ariz. 452, 467 ¶ 65, 307 P.3d 19, 34 (2013). The evidence sufficiently supports an aggravating circumstance if reasonable persons could find its existence beyond a reasonable doubt. *Id.* "We must uphold a jury's decision that death is appropriate if any 'reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency.'" *Id.* (citation omitted).

### A.    Constitutionality of A.R.S. § 13-756(A)

**¶143**        Forde argues that the abuse-of-discretion review required by A.R.S § 13-756(A) violates her rights to due process and to be free from cruel and unusual punishment by failing to provide for meaningful independent review. We have repeatedly rejected this argument. *See, e.g., Benson*, 232 Ariz. at 467 ¶ 67, 307 P.3d at 34.

**¶144**        Forde also asserts that the legislature improperly encroached on this Court's rulemaking authority by prescribing a standard for reviewing death penalty sentences. She urges us to independently review her sentence as we did with death sentences imposed for murders committed before the effective date of § 13-756(A).

**¶145**        The Arizona Constitution vests this Court with the power to make procedural court rules. Ariz. Const. art. 6, § 5(5) ("The Supreme Court shall have: . . . [p]ower to make rules relative to all procedural matters in any court."). Additionally, the constitution prohibits one branch from exercising another branch's powers. *Id.* art. 3. But statutes that supplement our rules are valid. *Seisinger v. Siebel*, 220 Ariz. 85, 89 ¶ 8, 203 P.3d 483, 487 (2009). "[I]t is more accurate to say that the legislature and this Court both have rulemaking power, but that in the event of irreconcilable conflict between a procedural statute and a rule, the rule prevails." *Id.*

**¶146**        A standard of appellate review is a matter of procedural, rather than substantive, law as it provides a method for obtaining redress for the invasion of rights and does not create, define, or regulate rights. *See id.* at 92–93 ¶ 29, 203 P.3d at 490–91; *see also Pima Cnty. v. Pima Cnty. Law Enforcement Merit Sys. Council,* 211 Ariz. 224, 228 ¶ 16, 119 P.3d 1027, 1031 (2005) (characterizing the standard of review as a procedural matter). But because neither our rules of criminal appellate procedure nor our

cases independently fixes a standard of review, § 13-756(A) supplements rather than conflicts with our procedures.

## B. Aggravating Circumstances

¶147 The jury unanimously found the following aggravating circumstances for both murders beyond a reasonable doubt: (1) Forde was previously convicted of another serious offense, A.R.S. § 13-751(F)(2); (2) she committed the murders in expectation of pecuniary gain, § 13-751(F)(5); and (3) she committed multiple homicides, § 13-751(F)(8). The jury also found the § 13-751(F)(9) age-of-the-victim aggravator proven beyond a reasonable doubt as to Brisenia's murder.

### 1. A.R.S. § 13-751(F)(2)

¶148 Although Forde challenges the constitutionality of the (F)(2) aggravator, *see supra* ¶¶ 105–08, she does not contest that sufficient evidence supports its application. Forde's convictions for first degree burglary, aggravated assault, and robbery established this aggravating circumstance. *See* A.R.S. §§ 13-751(J)(4), (8), (9). The jury did not abuse its discretion by finding the (F)(2) aggravator proven beyond a reasonable doubt.

### 2. A.R.S. § 13-751(F)(5)

¶149 Forde argues that insufficient evidence shows that she "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-751(F)(5). We will uphold the jury's finding if it is supported by substantial evidence. *State v. Roque*, 213 Ariz. 193, 218 ¶ 93, 141 P.3d 368, 393 (2006).

¶150 The (F)(5) aggravator does not automatically apply to felony murder convictions predicated on robbery or burglary. *Lynch*, 225 Ariz. at 40 ¶ 70, 234 P.3d at 608. Rather, the state must prove that pecuniary gain was a "motive, cause, or impetus for the murder and not merely the result." *State v. Canez*, 202 Ariz. 133, 159 ¶ 91, 42 P.3d 564, 590 (2002) (citation and internal quotation marks omitted); *see also Lynch*, 225 Ariz. at 40 ¶ 70, 234 P.3d at 608.

¶151    Substantial evidence shows that Forde's desire for pecuniary gain was a motive for the murders. She planned and participated in the robbery to fund her minuteman operation. She involved people she knew wanted to kill Flores to facilitate the robbery and burglary. Forde's lack of surprise that Bush shot Flores and Gina, Forde's later call to "finish off" Gina, and her text message to Gaxiola after the murders emphasizing "competition gone" demonstrate, at a minimum, she was willing to facilitate the murders to accomplish the robbery. The jury did not abuse its discretion by finding the (F)(5) aggravator.

### 3.    A.R.S. § 13-751(F)(8)

¶152    The (F)(8) aggravator exists if "[t]he defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense." To prove this aggravator, the state must show that the homicides were "temporally, spatially, and motivationally related, taking place during one continuous course of criminal conduct." *State v. Prasertphong*, 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003) (citation and internal quotation marks omitted). Forde does not contest that the murders were temporally and spatially related. She argues, however, that insufficient evidence shows she shared Bush's motivation to kill Brisenia, and the jury therefore necessarily and incorrectly imputed Bush's motives to her.

¶153    As explained in paragraph 151, Forde was motivated by pecuniary gain to facilitate the murders to fund her minuteman group. Substantial evidence showed that Bush shared this motive. Bush served as Forde's subordinate, participated in the home invasion, and hid with Forde at Gaxiola's house. In contrast, nothing suggests Bush had any involvement with the drug trade or Arivaca, desired to remove Flores from competing in the drug trade, or even knew Flores or his family before the murders. Forde's relationship with Bush supports a conclusion that they shared the same motive. The jury did not abuse its discretion by finding the (F)(8) aggravator.

### 4.    A.R.S. § 13-751(F)(9)

¶154    Although Forde challenges the constitutionality of the (F)(9) aggravator as applied to her, *see supra* ¶¶ 109–10, she does not contest, and sufficient evidence shows, that Forde was an adult at the time of the

murders, and Brisenia was under the age of fifteen. *See* A.R.S. § 13-751(F)(9). Consequently, the jury did not abuse its discretion by finding the existence of this aggravator.

### C.   Propriety of Death Sentences

¶155       A death sentence is appropriate if the jury does not find "mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-751(E). Forde argues that the following mitigation evidence called for leniency: (1) she was a relatively minor participant in the murders, *see* A.R.S. § 13-751(G)(3); (2) Gaxiola and Oakstar manipulated her involvement in the murders, which she did not foresee; (3) she suffered a very troubled childhood marked by sexual and physical abuse, abandonment, and teenage prostitution; and (4) she suffers from neuropsychological impairments, which stemmed from her traumatic childhood and a stroke suffered in 1996.[6] In effect, she disagrees with the jury's factual findings and assessment of the mitigation.

¶156       The jury's *Enmund/Tison* findings show that Forde did not prove the initial two categories of mitigation. *See* A.R.S. § 13-751(C) (providing that the defendant bears the burden of proving mitigators by a preponderance of the evidence). Forde presented evidence that she had a very troubled childhood and suffers neuropsychological impairments. But even if jurors found those matters proven, they did not abuse their discretion in finding this mitigation insufficient to call for leniency.

¶157       A reasonable juror could have concluded that the mitigation evidence was not sufficiently substantial to call for leniency. Because the jury properly found the existence of more than one aggravating circumstance for each murder, the jury did not abuse its discretion in finding that death sentences were appropriate.

---

[6]       Forde proposed the following additional mitigating circumstances to the jury: (1) polysubstance abuse; (2) family support; (3) public service promoting women's issues; (4) volunteer work; (5) compassion for victims; (6) disparity of treatment; (7) mercy; and (8) "morally reasoned response."

### D.     Other Constitutional Claims

**¶158**     Forde lists seventeen other constitutional claims that she acknowledges this Court has previously rejected but that she seeks to preserve for federal review.  We decline to revisit these claims.

### CONCLUSION

**¶159**     We affirm Forde's convictions and sentences, but order that her sentences for armed robbery (count seven) and aggravated robbery (count eight) run concurrently.