IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**JASPER PHILLIP RUSHING,**
*Appellant.*

---

No. CR-23-0113-AP
**Filed August 5, 2025**

---

Appeal from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge (Retired)
No. CR2010-007882-001

**AFFIRMED**

---

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Jason D. Lewis, Deputy Solicitor General/Section Chief of Capital Litigation, Jason P. Gannon (argued), Assistant Attorney General, Tucson, Attorneys for State of Arizona

Maricopa County Public Defender's Office, Dawnese Hustad (argued), Damon Rossi, Deputy Public Defenders, Attorneys for Jasper Phillip Rushing

---

CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which JUSTICES BOLICK, BEENE, KING, and CRUZ joined.*

_____

CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1          Jasper Phillip Rushing was sentenced to death after a jury found him guilty of first degree murder.   In 2017, we affirmed Rushing's conviction but vacated the death sentence and remanded for a new penalty phase proceeding.   *See State v. Rushing*, 243 Ariz. 212, 215–16 ¶ 1 (2017). On remand, a jury again determined that Rushing should be sentenced to death, and the superior court imposed that sentence.   We affirm.

## BACKGROUND

¶2          This Court's 2017 opinion fully explains the factual background underlying this case.   *See id.* at 216–17 ¶¶ 2–8.   In a nutshell, in 2010, Rushing killed victim Shannon P. while they were imprisoned in the same cell in the Lewis Prison Complex.   *Id.* at 216 ¶¶ 2–3.   Rushing bludgeoned Shannon's head with an improvised club and used a razor blade to slash his throat and sever his penis.   *Id.* ¶¶ 6–7.   Shannon died from "blunt force and sharp force injury."   *Id.* ¶ 6.

¶3          A jury convicted Rushing of premeditated first degree murder pursuant to A.R.S. § 13-1105(A)(1).[1]   *Id.* ¶ 8.   It then found three aggravating factors:

> (1) Rushing had been previously convicted of another offense
> for which life imprisonment or death could be or had been
> imposed, *see* A.R.S. § 13-751(F)(1); (2) Rushing committed the
> offense in an especially heinous or depraved manner, *see id.*
> § 13-751(F)(6); and (3) Rushing committed the offense while

_____

* Vice Chief Justice John R. Lopez IV and Justice William G. Montgomery are recused from this matter.

[1] We cite the current versions of statutes unless they have materially changed since Rushing committed the offense.

in the custody of the state department of corrections, *see id.*
§ 13-751(F)(7)(a).

*Id.* After reviewing the mitigating evidence, the jury found that death was the appropriate sentence. *Id.* at 216–17 ¶ 8.

**¶4** On appeal, we affirmed Rushing's conviction and found no errors in the trial's aggravation phase. *See id.* at 216 ¶ 1, 220–21 ¶¶ 32–35. But to comply with *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Lynch v. Arizona*, 578 U.S. 613 (2016), we vacated the death sentence and remanded for a new penalty phase proceeding. *Rushing*, 243 Ariz. at 216 ¶ 1, 221–23 ¶¶ 36–44.

**¶5** On remand, Rushing waived his right to counsel and his right to present mitigating evidence after the trial court ensured that he waived these rights knowingly, intelligently, and voluntarily. During the ten-day penalty phase trial, Rushing had the assistance of advisory counsel. But he did not make an opening statement, present mitigating evidence, cross-examine witnesses, present a rebuttal case, make a closing argument, or make a statement in allocution. At the close of evidence, the jury returned a verdict finding that death was the appropriate sentence. The court imposed the sentence, and this automatic appeal followed. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## DISCUSSION

### A. The Fact Rushing Was Visibly Restrained Before The Jury Does Not Require A New Trial.

#### 1. Rushing did not object to wearing visible restraints.

**¶6** At a pretrial status conference, Rushing informed the court he wanted to wear his orange jail-issued jumpsuit rather than dress in civilian clothes. The judge urged him to reconsider, warning the jury might react negatively. Rushing acknowledged potential prejudice but said it would feel disingenuous to wear street clothes after twenty-five years in custody. At the prosecutor's request, the court found that Rushing knowingly, intelligently, and voluntarily waived his right to "dress out" in civilian clothes.

¶7          The discussion then turned to restraints. A sheriff's deputy stated Rushing would wear a standard leg brace and might also wear an "FTO belt."[2] The judge observed that Rushing had never misbehaved in his courtroom, and Rushing said he would remain at the defense table throughout trial.

¶8          At a later status conference, the court noted that the sheriff's office planned to cuff Rushing's left hand to a chain connected to a leather waist belt while leaving his right hand free. When asked, Rushing stated he was "fine" with the arrangement.

¶9          The record contains limited detail about what restraints were used before the jury and their visibility.[3] A trial video shows Rushing with a leather belt over his jumpsuit, left wrist cuffed, and with limited range of motion, though both hands were functional (for example, he used both to put on glasses). Except when standing for the entry of the judge or jurors, he remained seated throughout trial at the table farthest from the jury, flanked by advisory counsel; his legs were not visible. At oral argument before us, defense counsel stated Rushing also wore leg shackles that were audible but not visible to the jury. But the record does not reflect whether Rushing wore leg shackles or, if he did, whether the jury was aware of them. Notably, the State does not dispute that Rushing was visibly restrained in some way.

¶10         On the first day of trial, the prosecutor asked the court to formally justify using visible restraints. The judge initially responded that the restraints were Rushing's own choice, apparently considering them part of his jail garb. But after the prosecutor pushed for a secondary justification, the judge cited unspecified "security concerns" and stated he would have imposed some form of restraint even if Rushing wore civilian clothes. He reiterated that Rushing had chosen not to dress out, despite repeated advisement.

¶11         The judge then asked whether Rushing objected to "how [he was] being secured." Rushing responded that it felt "arbitrary based on

---

[2]  The record does not contain a description of an "FTO belt."

[3]  When ruling on whether and what type of restraints can be used in front of a jury, trial judges should ensure the record is clear about the type of restraints being used and their visibility to jurors.

the color of the clothing," but added, "I don't want to turn it into an appellate issue." The judge, referencing Rushing's prior murder conviction and the possibility of a death sentence, concluded restraints were warranted regardless of clothing choice. When asked about restraints a final time, Rushing confirmed he had no objection.

2. We review for fundamental error.

¶12 Rushing argues the trial court violated his due process rights by allowing him to be visibly restrained before the jury. The parties dispute the applicable standard of review—harmless error or fundamental error—with Rushing favoring the former. He claims he objected by telling the court the restraints seemed "arbitrary based on the color of the clothing." The State counters this was not an objection and urges review for fundamental error.

¶13 We agree with the State. Despite multiple opportunities, Rushing never objected to the restraints. His statement about arbitrariness was an observation, not an objection—further clarified by his follow-up comment, "I don't want to turn it into an appellate issue." When the court later asked if he objected to "any of the other restraints," he answered, "[n]o."[4] Although a defendant need not use the word "objection," he must show a clear intent to object to give the prosecutor and the court a chance to develop the record and rectify possible error. *See State v. Teran*, 253 Ariz. 165, 172–73 ¶¶ 25–26 (App. 2022). Rushing instead stated he was "fine" with the restraints at the pretrial conference and reaffirmed at trial he had no objection.

¶14 Because Rushing failed to object to the use of visible restraints, we review for fundamental error. *See State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018); *State v. Dixon*, 226 Ariz. 545, 551 ¶ 24 (2011). Under fundamental error review, the defendant bears the burden of proving that trial error occurred, the error was fundamental, and he was prejudiced by the error. *Escalante*, 245 Ariz. at 142 ¶ 21.

¶15 A defendant demonstrates that an error was fundamental by establishing one of three prongs: "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his

---

[4] The record does not reflect what "other restraints" were discussed. If Rushing's appellate counsel is correct, this may refer to the leg shackles.

5

defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* (emphasis in original). "If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice" by demonstrating that "without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* at 142 ¶ 21, 144 ¶¶ 29–31. But if the defendant establishes fundamental error under the third prong, "he has shown both fundamental error and prejudice, and a new trial must be granted." *Id.* at 142 ¶ 21.

### 3. The trial court erred by allowing visible restraints.

**¶16** Rushing argues the trial court erred by (1) failing to make constitutionally required, case-specific findings to justify using visible restraints, and (2) not ordering concealed restraints even if some level of restraint was warranted. The State counters—without elaboration—that restraints were justified by unspecified safety concerns and that the court had no obligation to use the least visible restraints.

**¶17** The due process guarantees of the Fifth and Fourteenth Amendments prohibit routine use of visible restraints during the penalty phase of a trial. *See Deck v. Missouri*, 544 U.S. 622, 626–27, 632 (2005). Their use implies that the judge viewed the defendant as dangerous, thereby undermining the jury's ability to accurately weigh all considerations and determine whether a defendant deserves death. *See id.* at 633. As noted in *Deck*, the use of visible restraints can be a "thumb [on] death's side of the scale." *Id.* (alteration in original) (quoting *Sochor v. Florida*, 504 U.S. 527, 532 (1992)). Thus, "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding" unless case-specific "special circumstances," such as "special security needs or escape risks" related to the defendant, call for shackling. *Id.*

**¶18** This Court's opinion in *State v. Gomez*, 211 Ariz. 494 (2005), is instructive. There, defendant Gomez represented himself during the aggravation and penalty phases while wearing jail garb. *Id.* at 502 ¶ 39. Over Gomez's objection, the trial court required him to wear shackles before the jury because jail policy required it for all defendants not dressed in civilian clothes. *Id.* at 502 ¶ 39, 504 ¶ 48. We found this an insufficient justification for using visible restraints because it "is clearly not the kind of 'case specific' determination of 'particular concerns' that *Deck* requires." *Id.* at 504 ¶ 49; *see also Dixon*, 226 Ariz. at 551 ¶ 25 (stating that "[a] trial

judge 'must have grounds for ordering restraints and should not simply defer to the prosecutor's request, a sheriff's department's policy, or security personnel's preference for the use of restraints.'" (quoting *State v. Cruz*, 218 Ariz. 149, 168 ¶ 119 (2008))); *cf. State v. Benson*, 232 Ariz. 452, 461 ¶ 30 (2013) (upholding a trial court's finding of case-specific concerns warranting non-visible restraints at a capital trial where the court had relied on an "individualized security risk assessment" of the defendant, "the potential for imposition of the death penalty, the layout of the particular courtroom and building," and the defendant's "admissions to police that he had strangled the victims with his hands after losing his temper"), *abrogated in part on other grounds as recognized by Cruz v. Arizona*, 598 U.S. 17 (2023). Because the shackling error was not harmless beyond a reasonable doubt, we vacated Gomez's death sentence and remanded for new sentencing proceedings. *See Gomez*, 211 Ariz. at 504–05 ¶ 51.

**¶19** Here, the trial court cited Rushing's prior murder conviction and current capital conviction to justify using visible restraints. The judge may also have deferred to the sheriff's policy regarding jail garb, though that is unclear. Regardless, neither rationale satisfies the requirements set forth in *Deck*, which mandate case-specific findings—for example, a security or escape risk—beyond a defendant's criminal history or institutional policy. *See Deck*, 544 U.S. at 633; *Gomez*, 211 Ariz. at 504 ¶¶ 47–49; *Dixon*, 226 Ariz. at 551–52 ¶¶ 25–26.

**¶20** Nothing in the record suggests that Rushing posed a security or escape risk in the courtroom. The judge even acknowledged that Rushing had "never misbehaved in [his] courtroom." The only justification was a generalized reference to "security concerns." But as in *Deck*, the court failed to articulate a specific reason for its concern or explain why non-visible restraints were not used. *See Deck*, 544 U.S. at 634–35; *Benson*, 232 Ariz. at 461–62 ¶¶ 28–32.

**¶21** The State's reliance on *State v. Lee*, 189 Ariz. 608 (1997), is misplaced. In *Lee*, visible restraints were warranted in large part because the defendant had attempted to escape from a holding cell before the first day of trial and assaulted a deputy—circumstances dissimilar to this case. *See id.* at 617. Besides, *Lee* predates *Deck* and *Gomez*, diminishing its persuasive value.

**¶22** For these reasons, the trial court erred by permitting visible restraints without sufficient justification supported by the record.

Rushing has met his burden of showing constitutional error. Thus, we need not decide whether a judge has an obligation to order the least visible means of restraint if the judge determines that restraints are needed.

### 4. Rushing has not shown fundamental, reversible error.

**¶23** Rushing primarily argues that the visible restraints constituted fundamental error under the third prong of *Escalante*'s second step. He relies on *Deck*'s observations that shackling is "inherently prejudicial" and undermines the presumption of innocence and the fairness of the factfinding process by suggesting to the jury that the defendant is a danger to society. *See* 544 U.S. at 630, 635 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)). Thus, he argues that using restraints was "so egregious that he could not possibly have received a fair trial," thereby automatically causing prejudice and requiring a new trial. *See Escalante*, 245 Ariz. at 142 ¶ 21. We disagree.

**¶24** Despite the inherent prejudice emanating from visual restraints, *Deck* recognized that a visually restrained defendant could still receive a fair trial. *See* 544 U.S. at 632. Specifically, it permitted use of visible restraints if justified by circumstances like courtroom security. *Id.* And the Court concluded that even if visible restraints lacked justification, a new trial is not warranted if the prosecution "prove[s] 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" *Id.* at 635 (second alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). These conclusions are inconsistent with Rushing's argument that visible shackling is "so egregious" that a new trial is always required. *See Escalante*, 245 Ariz. at 142 ¶ 21. Prong three of *Escalante*'s second step does not apply here.

**¶25** Rushing also argues that the trial court's error was fundamental under *Escalante*'s first prong because visible shackling went to the foundation of the case. We need not decide this issue because, even assuming Rushing proved fundamental error under prong one, the use of visible restraints did not result in prejudice warranting a new trial. Critically, *Deck* was a harmless-error-review case. But because we review for fundamental error, to receive a new penalty phase trial Rushing must demonstrate separate prejudice—specifically, that "without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *See id.* at 144 ¶¶ 29–31.

**¶26** Rushing contends the visible restraints prejudiced him because, in the absence of any mitigating evidence, his appearance and treatment by the justice system took on heightened significance. He contends the restraints undermined his ability to "humanize himself through demeanor and presence." We reject this argument.

**¶27** Notably, Rushing presented no mitigating evidence to counter three significant aggravating factors. He appeared before the jury in jail-issued clothing, which signaled dangerousness even without restraints. *See Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing that jail garb provides a constant reminder of the accused's condition and may affect a juror's judgment). He chose not to address the jury or even speak by cross-examining witnesses, raising objections, or presenting mitigating evidence. Aside from responding briefly to the judge's questions, he remained a silent figure in jail garb at counsel table. Any lack of "humanization" largely resulted from these decisions coupled with his convictions for two horrific murders.[5] We cannot conclude that the partial restraint of one hand or the sound of shackles, assuming they existed, created any separate prejudice. Through his choices, Rushing had already placed a "thumb [on] death's side of the scale," and the restraints did not add meaningful weight. *See Deck*, 544 U.S. at 633 (alteration in original) (quoting *Sochor*, 504 U.S. at 532). Regardless, the court instructed the jury not to consider Rushing's decision not to dress out, and while no separate instruction was given regarding restraints, the jury may have viewed them as part of the jail garb. *See State v. Strong*, 258 Ariz. 184, 212 ¶ 124 (2024) ("We presume the jury follows the court's instructions.").

**¶28** Under these circumstances, Rushing has not shown that the visible restraints tipped the balance and that, without them, a reasonable jury could have plausibly and intelligently recommended a life sentence. *See Escalante*, 245 Ariz. at 144 ¶¶ 29–31. Accordingly, he has not established prejudicial, fundamental error, and we reject his claim.

**B. Rushing Is Not Entitled To Appellate Relief From His Decision Not To Present Mitigating Evidence To The Jury.**

**¶29** Rushing argues the trial court erred by accepting his waiver of the right to present mitigating evidence. He does not challenge the

---

[5] At the time of the murder in this case, Rushing was serving a prison sentence for killing his stepfather. *See infra* ¶ 59.

court's finding that his waiver was knowing, intelligent, and voluntary. Rather, he asserts that by not ensuring the jury was presented with all mitigating evidence, the court violated his rights to due process, to a fair trial, and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Rushing further argues that consistent with his Sixth Amendment right of self-representation and the public and societal interest in the fair administration of the death penalty, the trial court erred by not constructing an alternative way to present mitigating evidence, like appointing a neutral third party to present that evidence.

¶30 We find Rushing invited any error, and he is therefore precluded from obtaining relief. *See State v. Allen*, 253 Ariz. 306, 343 ¶ 122 (2022) (stating that inviting an error precludes appellate review). "The purpose of the [invited error] doctrine is to prevent a party from 'inject[ing] error in the record and then profit[ing] from it on appeal.'" *State v. Logan*, 200 Ariz. 564, 566 ¶ 11 (2001) (second and third alterations in original) (quoting *State v. Tassler*, 159 Ariz. 183, 185 (App. 1988)). Here, Rushing knowingly, intelligently, and voluntarily waived presenting mitigating evidence. He does not contest that. He cannot now complain that the trial court erred by accepting that waiver rather than interfering with his self-representation by requiring a presentation of mitigating evidence. *See Ripkowski v. State*, 61 S.W.3d 378, 389 (Tex. Crim. App. 2001) ("Because appellant requested that the mitigation issue be omitted, he cannot now complain about the trial court's alleged lack of authority to withdraw the issue from the jury's consideration."); *Adkins v. State*, 930 So. 2d 524, 539–40 (Ala. Crim. App. 2001) ("We join the majority of jurisdictions that have considered this issue and hold that a defendant is estopped from raising a claim of ineffective assistance of counsel for counsel's failure to present mitigating evidence when the defendant waived the presentation of mitigating evidence.").

¶31 Alternately, even if we reviewed for fundamental error, as Rushing asks, we would not find error. *See Escalante*, 245 Ariz. at 142 ¶ 21 (explaining that under fundamental error review, the defendant must first establish the trial court erred). This Court has "repeatedly and consistently held that competent defendants may constitutionally waive the presentation of mitigating evidence, so long as they do so knowingly, voluntarily, and intelligently." *State v. Montoya*, 258 Ariz. 128, 161 ¶ 100 (2024); *see also State v. Riley*, 248 Ariz. 154, 198–201 ¶¶ 188–202 (2020); *State v. Gunches*, 240 Ariz. 198, 203–04 ¶¶ 15–20 (2016); *State v. Hausner*, 230 Ariz.

60, 84–86 ¶¶ 116–22 (2012). And we have refused to interfere with a defendant's constitutional right to self-represent by requiring either the defense or a third party to present mitigating evidence over the defendant's objection. *See Hausner*, 230 Ariz. at 85 ¶ 119; *Riley*, 248 Ariz. at 200–01 ¶¶ 197, 199. Rushing has failed to demonstrate that those cases are "clearly erroneous or manifestly wrong" and should therefore be overruled. *See Montoya*, 258 Ariz. at 161 ¶ 100 (quoting *Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95, 100 ¶ 17 (2023)).

## C. The Trial Court Did Not Err By Refusing To Give Rushing's Proposed Jury Instructions.

¶32 Rushing argues the trial court violated his rights under the Fifth, Eighth, and Fourteenth Amendments, as well as article 2, sections 4, 15, and 24 of the Arizona Constitution, by rejecting nearly all his proposed jury instructions. The court provided the parties with proposed jury instructions based on the Revised Arizona Jury Instructions ("RAJIs") for penalty phase proceedings.[6] Rushing suggested additions and deletions to those instructions, and the court adopted some.[7] It rejected the rest with little or no explanation or by saying the suggested language was not in a RAJI.

¶33 We review the trial court's refusal to give a requested jury instruction for an abuse of discretion. *Allen*, 253 Ariz. at 349 ¶ 152; *see also State v. Bolton*, 182 Ariz. 290, 309 (1995) (stating in a capital case that we will not upset a trial court's decision not to give a requested instruction "absent a clear abuse of [the court's] discretion"). The court abused its discretion if the refusal to give an instruction was "clearly untenable, legally incorrect,

---

[6] The State Bar of Arizona Criminal Jury Instruction Committee created the RAJIs. *See State v. Miller*, 251 Ariz. 99, 103 ¶ 13 (2021). Although we have not sanctioned the RAJIs, we recognize that the legal profession views them as accurate explanations of the law. *See id.*

[7] Rushing's proposed jury instructions are not included in the record on appeal. However, in an appendix to his opening brief, he provides his requested amendments to the trial court's proposed final instructions, along with an affidavit from one of his advisory trial counsel. According to counsel, she emailed the document to the trial judge's judicial assistant. The State does not dispute that the trial court considered these proposed instructions.

or amount[ed] to a denial of justice." *State v. Chapple*, 135 Ariz. 281, 297 n.18 (1983), *superseded by statute on other grounds*. But "we assess the legal adequacy of the instructions de novo, viewing them in their entirety." *State v. Smith*, 250 Ariz. 69, 95 ¶ 116 (2020) (quoting *State v. Miller*, 234 Ariz. 31, 43 ¶ 41 (2013)).

**¶34** A defendant is entitled to jury instructions on defense theories reasonably supported by the evidence. *See State v. Forde*, 233 Ariz. 543, 566 ¶ 91 (2014); *State v. Hoskins*, 199 Ariz. 127, 146 ¶ 78 (2000). But when the jury is properly instructed on the law, the court is not required to provide additional instructions that simply reiterate or enlarge instructions in the defendant's preferred language. *See Forde*, 233 Ariz. at 566 ¶ 91; *Hoskins*, 199 Ariz. at 146 ¶ 78. Importantly, jury instructions cannot "mislead the jury in any way and must give the jury an understanding of the issues." *Teran*, 253 Ariz. at 170 ¶ 12 (quoting *State v. Noriega*, 187 Ariz. 282, 284 (App. 1996)).

1. RAJIs

**¶35** Rushing first argues the trial court erred by rejecting proposed instructions because they were not a RAJI. He asserts that the court's "formulaic response" when ruling demonstrates it did not consider his due process right to support his theory of defense against the death penalty. Rushing further argues that this "global rejection" of his proposed instructions obstructed his right to have the jury consider all relevant mitigating evidence. We are unpersuaded.

**¶36** First, we are unaware of any authority requiring a trial court to explain why it rejected a proposed instruction, and Rushing does not point to any authority. Second, the court did not blindly adhere to the RAJIs or "globally reject" Rushing's requests. Rather, it considered Rushing's proposed instructions and used some of his suggested language. Third, although the RAJIs are not infallible, they are generally considered to accurately state the law. *See Miller*, 251 Ariz. at 103 ¶ 13. Thus, when the judge here said the proposed language was not in the RAJIs, he effectively communicated that it was either inaccurate or already covered by some other instruction. The trial court did not err by providing this short-hand justification throughout. It would have been better, however, if the court had elaborated on its reasons for rejecting Rushing's proposed instructions by explaining, for example, they were inaccurate or repetitive.

Even brief explanations assist appellate review, and we urge trial court judges to explain their reasoning for rejected proposed jury instructions.

**¶37**      Our focus is whether the court acted within its discretion by declining to give Rushing's proposed instructions.   We group these proposed instructions according to their subject matter and address each in turn.

2.   Specific proposed jury instructions

a.   *Juror autonomy and unanimity*

**¶38**      Rushing proposed interspersing the following language throughout the instructions, emphasizing that each juror must independently determine the appropriate sentence, resist any form of coercion or pressure, and understand that any verdict must be unanimous:

1) "Meaning any one juror can choose life and there will be no death verdict from this jury."

2) "[Y]ou do not need to unanimously agree on a particular mitigating circumstance because it is an individual, moral determination, based off your own sense of morality and mercy."

3) "A juror is never required to, nor can they be compelled to justify, explain, or put into words a reason for his or her vote."

4) "Each juror's vote will be respected and accepted by the judge, the prosecutor, and the State of Arizona."

5) "The law does not provide an answer to this personal, individual, moral question. All juror's feelings and reasons for voting for a life sentence are entitled to respect."

6) "However, the State of Arizona is always satisfied with a life sentence in this case, in any case and even in the worst case you can imagine. If you cannot unanimously agree, please do not speculate on the outcome of this case. You will have done your job as jurors under any of these three scenarios."

7) "The word deliberate simply means to thoughtfully consider the evidence in order to make your own, individual determination as to whether the Defendant should spend the rest of his life in prison or be sentenced to death."

8) "Deliberations are not a means to bully or gang up on fellow jury members to impose one view over another. Each juror has the right to bring their individual, moral determination as to the Defendant's sentence into the courtroom and have it heard. If deliberations do turn contentious, any juror has the right to knock on the jury room door and tell the bailiff deliberations are over."

He argues the trial court erred by refusing to include this language in the instructions because it was accurate, relevant, and needed to educate and empower a juror inclined to vote for a life sentence to resist bullying tactics by jurors inclined to vote for a death sentence.

**¶39**        The trial court did not err.   Proposal six misstated the law because a life sentence is not always acceptable.   Jurors were required to impose the death sentence if they found "no mitigating circumstances sufficiently substantial to call for leniency."   *See* § 13-751(E).

**¶40**        It was also unnecessary for the court to include the remaining proposed language in the jury instructions.   Other instructions adequately explained in easy-to-understand language that mitigation assessment is an individual determination; unanimity was not required to find any mitigating circumstance; and jurors should not feel pressured to change their honest beliefs by other jurors or to return a unanimous verdict.   For example, the court instructed:

> While all 12 of the jurors in the first trial had to unanimously agree that the State proved beyond a reasonable doubt the existence of a statutory aggravating circumstance, you do not need to unanimously agree on a particular mitigating circumstance. Each one of you must decide individually whether any mitigating circumstance exists.
>
> . . . .
>
> You individually determine whether mitigation exists.

14

. . . .

A mitigating factor that motivates one juror to vote for a sentence of natural life in prison may be evaluated by another juror as not having been proved or, if proved, as not significant to the assessment of the appropriate penalty.

. . . .

This assessment is not a mathematical one but instead must be made in light of each juror's individual qualitative evaluation of the facts of the case, the severity of the aggravating factors and the quality of the mitigating factors found by each juror.

. . . .

As jurors you have a duty to discuss the case with one another and to deliberate in an effort to reach a just verdict. Each of you must decide the case for yourself but only after you consider the evidence impartially with your fellow jurors. During your deliberations you should not hesitate to re-examine your own views and change your opinion if you become convinced that it is wrong. However, you should not change your honest belief concerning the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.

Although not stated as directly as Rushing would have preferred, the court also communicated it would respect and accept a juror's vote:

I do not mean to indicate any opinion on the evidence or what your verdict should be by any ruling or remark I have made or may make. I am not allowed to express my feelings in this case, and if I have shown any you must disregard them. You and you alone are the triers of fact.

. . . .

It is for you, as jurors, to decide what you individually believe is the appropriate sentence.

**¶41**      In sum, these instructions adequately described the deliberative process and the jury's role.   They directed jurors to impartially consider the evidence, examine their own views, and discuss the evidence with fellow jurors, but decide the appropriate sentence for themselves.    Rushing's proposed language was either misleading or added nothing other than emphasizing existing instructions or rephrasing these concepts "in language precisely to his liking."   *Hoskins*, 199 Ariz. at 146 ¶ 78; *see Forde*, 233 Ariz. at 566 ¶ 91.   The trial court did not err.

### b.   *Mitigation*

#### (i).   *Definition and role*

**¶42**      Rushing asked the court to include this language to define "mitigation" and its role in determining a sentence:

1) "Mitigation is any individual juror's reason for a life sentence."

2) "A juror may lawfully vote for a life penalty even if the defendant presents no mitigating circumstances."

3) "Mitigation can be found from any evidence in the record irrespective of which party presents it. Each of you must individually determine what the mitigating factors are. Mitigation can be something you hear, something observed in Court, or something you feel, even if you are unable to articulate it. Because of this, mitigation factors do not need to be agreed upon unanimously. What may be mitigating to one juror may not be mitigating to the other."

Rushing contends that the proposed instructions were accurate and necessary to clarify that mitigation may arise from any source and may include anything a juror deems relevant, including the juror's own compassionate beliefs.

**¶43**      The court did not err by declining Rushing's requests.   The proposed instructions misstated the law by suggesting that what

constitutes mitigating evidence is limitless. Mitigating evidence must be relevant and "includ[e] any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." *See* § 13-751(G); *see also Smith*, 250 Ariz. at 95–96 ¶ 118 (interpreting § 13-751(G)). And a jury cannot consider "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." S*tate v. Carreon*, 210 Ariz. 54, 70 ¶ 84 (2005) (quoting *California v. Brown*, 479 U.S. 538, 540 (1987)); *see also Brown*, 479 U.S. at 545 (O'Connor, J., concurring) ("[T]he sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime rather than mere sympathy or emotion." (emphasis omitted)).

¶**44** Moreover, the accurate portions of Rushing's proposed instructions were encompassed in the court's instructions and did not need to be repeated. *See Forde*, 233 Ariz. at 566 ¶ 91. The court defined "mitigating circumstances" as follows:

> Mitigating circumstances are any factors that are a basis for a natural life sentence, instead of a death sentence, so long as they relate to any sympathetic or other aspect of the defendant's character, propensity, history or record, or circumstances of the offense.

> Mitigating circumstances are not an excuse or justification for the offense but are factors that in fairness or mercy may reduce the defendant's moral culpability. Each juror individually determines what significance to give to any mitigation they find to exist.

The court also told jurors they could find mitigating evidence from any source:

> Mitigating circumstances may be found from any evidence presented during this sentencing trial.

> You should consider all of the evidence without regard to which party presented it. Each party is entitled to consideration of the evidence, whether produced by that party or by another party.

> . . . .

Mitigating circumstances may be offered by the defendant or the State or be apparent from the evidence presented during this sentencing trial.

**¶45**    The court did not err by declining to instruct the jury using Rushing's proposed language.   *See id.*

(ii)   *Moral judgment*

**¶46**    Rushing asked the court to elaborate on the moral judgment jurors would make in sentencing, using the following language:

1)  "When jurors determine whether a person should live or die, they are making an individual moral judgment. There is no right or wrong answer to a moral question. What is right for one juror might not be right for another. Each individual juror may lawfully vote for life based on any reason that is mitigating to them."

2)  "It is based off each individual juror's own morals, background, and sense of mercy."

He argues that because he did not present evidence, the jury needed this language to assist in identifying mitigation.   He asserts that his proposed language accurately reflected the law and was not explained elsewhere in the court's instructions.   Without it, he argues, the jurors were not told they could vote for a life sentence for any reason they find mitigating.   And because Rushing proposed that the latter language appear at the end of an instruction stating that jurors should not mathematically weigh aggravating and mitigating factors and the case facts, he argues that his language was needed to assist jurors in assigning a non-quantitative "value" to evidence.

**¶47**    The trial court did not err.   As previously explained, to the extent this language suggests that mitigation is limitless or can be based solely on sympathy or mercy, it is incorrect.   *See supra* ¶ 43.   And although the proposed language told jurors they must make their own decision, other instructions conveyed that information.   *See supra* ¶ 40. Further, the court adequately instructed the jurors about making a reasoned, moral judgment:

The law does not presume what is the appropriate sentence. The defendant does not have the burden of proving that natural life is the appropriate sentence. The State does not have the burden of proving that death is the appropriate sentence. It is for you, as jurors, to decide what you individually believe is the appropriate sentence.

In reaching a reasoned, moral judgment about which sentence is justified and appropriate you must decide whether one or more of the mitigating factors is sufficiently substantial to call for leniency. To do this you must consider the quality and the strength of aggravating and mitigating factors as well as the facts and circumstances of the case.

This assessment is not a mathematical one but instead must be made in light of each juror's individual qualitative evaluation of the facts of the case, the severity of the aggravating factors and the quality of the mitigating factors found by each juror.

¶48 In sum, the trial court did not abuse its discretion by rejecting Rushing's proposed instructions.

**D. The Trial Court Did Not Commit Fundamental, Reversible Error By Declining To Define "Moral Culpability" For The Jury.**

¶49 The trial court instructed the jury in relevant part as follows:

Mitigating circumstances are any factors that are a basis for a natural life sentence, instead of a death sentence, so long as they relate to any sympathetic or other aspect of the defendant's character, propensity, history or record, or circumstances of the offense.

Mitigating circumstances are not an excuse or justification for the offense but are factors that in fairness or mercy may reduce the defendant's **moral culpability**. Each juror individually determines what significance to give to any mitigation they find to exist.

> Mitigating circumstances may be offered by the defendant or the State or be apparent from the evidence presented during this sentencing trial. You are not required to find that there is a connection between a mitigating circumstance and the crime committed in order to consider the mitigation evidence. Any connection or lack of connection may impact the quality and strength of the mitigation evidence.

(Emphasis added.)    During deliberations, the jury sent a note asking, "Can we get a definition of 'moral culpability'?"    The trial court informed the parties it intended to refer the jury to the instructions rather than attempt to define the term.    When asked, Rushing said he did not object.    The court then referred the jury to the instructions.

**¶50**        Rushing now argues the trial court violated the Fifth, Eighth, and Fourteenth Amendments by declining to define "moral culpability." He asserts that "moral culpability" is not a straightforward concept, and the jury could not have properly understood what it meant without a definition.    Citing *Simmons*, he further argues the court violated his due process rights because it failed to correct jurors' evident misunderstanding about the meaning of "moral culpability."    *See* 512 U.S. 154.    Because Rushing did not object, we review for fundamental error.    *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005).

**¶51**        "A trial court need not 'define every phrase or word used in the [jury] instructions, especially when they are used in their ordinary sense and are commonly understood.'"    *Forde*, 233 Ariz. at 564 ¶ 82 (alteration in original) (quoting *State v. Eastlack*, 180 Ariz. 243, 259 (1994)).    But when the jury appears confused on a legal issue and clarity cannot be obtained from the instructions, "the trial judge has a 'responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria.'" *State v. Ramirez*, 178 Ariz. 116, 126 (1994) (quoting *Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976)).    Whether to further instruct the jury or refer it to the instructions, however, is within the trial court's discretion.    *See id.* We review the adequacy of jury instructions from the viewpoint of a reasonable juror.    *See Carreon*, 210 Ariz. at 70–71 ¶ 84 (citing *Brown*, 479 U.S. at 540).

**¶52**        It is a close call whether the court erred by refusing to define "moral culpability" for the jury.    Without doubt, the term is plainly

understood as meaning blameworthiness according to principles of right and wrong. *Moral*, Merriam-Webster, https://www.merriam-webster.com/dictionary/moral (last visited July 14, 2025) (defining "moral" as "of or relating to principles of right and wrong in behavior"); *Culpable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/culpable (last visited July 14, 2025) (defining "culpable" as "meriting condemnation or blame"). Thus, in context, jurors were told that "mitigating circumstances" meant any factors that "in fairness and mercy" made Rushing less blameworthy from a moral viewpoint for murdering Shannon. Although the prosecutor parroted the instruction several times in her closing argument, she did not cloud this meaning. But people do not commonly use "moral culpability" or even "culpability" in everyday language. The fact the jury asked its question indicated some uncertainty—or at least disagreement—about the meaning of "moral culpability." Referring jurors to the instructions was unhelpful because the instructions did not define the term. Under the circumstances, it may have been better for the court to have given the jury the plain meaning of the term.

**¶53** But we need not determine whether the court committed error by not answering the jury's question because even if it did, it did not commit fundamental error. Refusing to define "moral culpability" did not go to the foundation of the case, did not take away a right essential to Rushing's defense against the death penalty, and was not so egregious that Rushing could not have received a fair trial. *See Escalante*, 245 Ariz. at 142 ¶ 21.

**¶54** First, the jury instructions properly and clearly instructed the jury on the legal criteria for imposing a death sentence, including an explanation of what constitutes "mitigating circumstances." *See Allen*, 253 Ariz. at 335 ¶ 199 (approving a similar instruction); *State v. Kuhs*, 223 Ariz. 376, 386–87 ¶¶ 53–55 (2010) (same). The court told jurors that mitigating evidence consisted of factors related to Rushing's character or background or the circumstances of the offense that in "fairness and mercy" suggest a life sentence instead of a death sentence. The court also told jurors that mitigating evidence could come from any source and did not have to be connected to the offense. And because the court instructed that each juror must individually assign significance to any mitigation, it necessarily fell to each juror to determine what factors made Rushing less blameworthy according to that juror's unique moral view.

¶55          Second, we cannot know whether the jury's question reflected confusion or misunderstanding about a legal principle.  *See Ramirez*, 178 Ariz. at 126.   Rather, jurors may have sought a single definition because they had different ideas about what it meant to be morally culpable for murder.   What constitutes "moral culpability" can differ among jurors, and jurors may have had differing, but definite, ideas about the term's meaning.   Thus, the case here is unlike *Simmons* where the instructions and the trial court's answer to a jury question left jurors misinformed about the availability of parole as part of a possible life sentence.   *See* 512 U.S. at 170–71.

¶56          In sum, even if the trial court erred by not giving the jury the plain meaning of "moral culpability," it did not commit fundamental error. Thus, the court did not violate Rushing's Fifth, Eighth, and Fourteenth Amendment rights because the instructions did not improperly limit what the jury could consider as mitigating evidence.   *See Carreon*, 210 Ariz. at 70 ¶ 83.

### E.    Rushing Is Not Entitled To Appellate Relief Based On Alleged Prosecutorial Error.

¶57          Rushing argues the prosecutor committed cumulative prosecutorial error during the penalty phase by (1) intentionally withholding mitigating evidence; and (2) misstating the law concerning mitigating evidence in closing argument.   Rushing does not assert that either alleged error alone warrants a new penalty phase trial but instead argues that together the errors deprived him of a fair proceeding, thus warranting a new trial.   Rushing did not raise any objection at trial, and we therefore review for fundamental error.   *See State v. Hulsey*, 243 Ariz. 367, 388 ¶ 88 (2018).

¶58          Prosecutorial error "broadly encompasses *any conduct* that infringes a defendant's *constitutional rights*.   It sweeps in prosecutorial conduct ranging from inadvertent error or innocent mistake to intentional misconduct."   *State v. Murray*, 250 Ariz. 543, 548 ¶ 12 (2021) (emphasis in original) (quoting *In re Martinez*, 248 Ariz. 458, 469 ¶ 45 (2020)).   When a defendant raises a claim of cumulative prosecutorial error, "we review each alleged incident individually for error, after which we decide whether the cumulative effect of any errors we find so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Montoya*, 258

Ariz. at 142 ¶ 10 (quoting *State v. Robinson*, 253 Ariz. 121, 143 ¶ 64 (2022)); *see also State v. Vargas*, 249 Ariz. 186, 190 ¶ 14 (2020) (to same effect).

1. <u>The prosecutor did not improperly withhold mitigating evidence.</u>

**¶59**     At the time he killed Shannon, Rushing was serving a life sentence for murdering his stepfather, Rudy, in 2001 by shooting him in the back of his head while he slept beside his ex-wife.   After the ex-wife was startled awake, Rushing said he shot Rudy for sexually molesting Rushing's sister, Amy.   Rushing repeated that justification later to another person.

**¶60**     During the penalty phase trial, the prosecutor called Detective Paul Dalton, formerly with the Phoenix Police Department, to relate Rushing's criminal history, including Rudy's murder.   The prosecutor tried to refute Rushing's purported justification for killing Rudy by eliciting testimony from Dalton about an interview with Amy in 2001:

Q. Was she specifically interviewed about what Jasper Rushing said that Rudy had done to her?

A. Yes.

Q. Did Amy say . . . that Rudy never attempted or did anything of a sexual nature with her?

A. That's what she said, yes.

Q. So she denied that Rudy had ever done or attempted to do anything sexual with her?

A. Correct.

. . . .

Q. Did Amy give any idea why the defendant would think she had been sexually molested or assaulted by Rudy?

**A. She had an -- yes. She said that she later learned that another sister –**

**Q. Well, let's talk about 2001.**

A. Oh, 2001. No. Okay. I'm sorry.

Q. In 2001 during this initial investigation did Amy say that she had no idea why Jasper Rushing would think she had been sexually molested or assaulted by Rudy?

A. Correct, yes.

(Emphasis added.) During closing argument, the prosecutor portrayed Rushing as believing himself "above the law," crafting his own narrative to justify his violence—exemplified by his decision to kill Rudy based on an unconfirmed belief that Rudy had molested Amy.

¶61 Rushing argues the prosecutor improperly withheld mitigating evidence by interrupting Dalton and preventing him from telling jurors what Amy had "later learned." Rushing surmises Dalton would have provided "vital mitigation" supporting Rushing's reasonable belief that Rudy had molested Amy, but the prosecutor improperly redirected Dalton's testimony to avoid that result. Rushing therefore argues this was fundamental, prejudicial error because under the Eighth and Fourteenth Amendments, a jury cannot be prevented from hearing all relevant mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (concluding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis and footnote omitted)); *cf. Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982) ("Just as the [s]tate may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." (emphasis omitted)).

¶62 We do not discern prosecutorial error. The prosecutor was not required to introduce mitigating evidence for Rushing. *See Montoya*, 258 Ariz. at 161 ¶ 100 (stating the Eighth Amendment does not require that the jury be presented with all mitigating evidence); *Riley*, 248 Ariz. at 200 ¶ 197 (rejecting defendant's argument that we should "require[] prosecutors to compile comprehensive reports of potentially mitigating evidence when a defendant refuses to present his own mitigation"). All

the Eighth and Fourteenth Amendments require is that *the defendant* be permitted to introduce all mitigating evidence. *See Lockett*, 438 U.S. at 605; *Montoya*, 258 Ariz. at 161 ¶ 100. Nothing prevented Rushing from cross-examining Dalton and asking about what Amy later learned.

**¶63** Although the prosecutor did not have a duty to introduce mitigating evidence, she did have a duty to see that Rushing received a fair trial. *See State v. Minnitt*, 203 Ariz. 431, 440 ¶ 41 (2002). Thus, had she left the jury with a false impression of the available evidence, we might agree that the prosecutor committed error. But she did not do that. Instead, later during Dalton's examination she introduced an audio recording and transcript of Amy's statements to authorities in 2012, which explained a basis for Rushing's belief. Specifically, Amy said her step-sister, Justine, had falsely told Rushing that Rudy had molested Amy. Amy also said that Rushing never asked her whether Rudy had, in fact, molested her.

**¶64** For these reasons, we conclude that the prosecutor did not commit error by interrupting Dalton's answer about what Amy had told authorities.

### 2. The prosecutor did not misstate the law during closing argument.

**¶65** During her closing argument, the prosecutor suggested the jury follow four steps in determining the appropriate sentence. Rushing argues the prosecutor committed error by misstating the law during each "step."

**¶66** A prosecutor may not misstate the law in closing arguments. *Allen*, 248 Ariz. at 365 ¶ 49. To determine whether the prosecutor misstated the law here, we consider each of the prosecutor's statements in context. *See State v. Sanders*, 245 Ariz. 113, 131 ¶¶ 78–80 (2018).

#### a. *Step one statements*

**¶67** In suggesting a deliberative process, the prosecutor told jurors they should first determine whether mitigating evidence has been proven. She stated that mitigating evidence is proven when the fact suggested as mitigation "is more probably true than not true," and cautioned that "[i]f you do not find a fact suggested as mitigation to be more probably true than not true then you must not consider it any further."

Later, she told jurors to "[e]valuate all of the evidence when you decide what you can or cannot believe from the defendant's statements to investigators, or if there is actually any mitigation proven from anything he said."

**¶68**        Rushing argues that these statements falsely suggested that mitigating evidence was limited to evidence "specifically offered and labeled" as mitigating or coming directly from Rushing's statements to investigators. We disagree. The prosecutor's initial statement reflected only the statutory requirement that a "defendant must prove the existence of the mitigating circumstances by a preponderance of the evidence." § 13-751(C). The second statement was made in the context of discussing Rushing's statements to investigators and did not suggest that any mitigation was limited to these statements. Indeed, parroting the jury instructions, the prosecutor told the jury that "mitigating circumstances may be offered by the defendant or the State or be apparent from the evidence presented at any phase of the proceedings." The prosecutor did not mislead the jury.

### b.  *Step two statements*

**¶69**        The prosecutor told jurors that any mitigating circumstance must be "relevant." To make that determination, she said they should ask whether the circumstance "reduces the degree of the defendant's moral culpability for the murder" or "relate[s] to any sympathetic or other aspect of the defendant's character, propensity, history or record, or circumstance of the offense."

**¶70**        Rushing argues these statements were incorrect and misleading because they suggested (1) a life sentence could not be entered if no mitigation existed; and (2) mitigating evidence must be relevant. We disagree. As previously explained, a death sentence is required if no mitigating evidence exists, and any mitigating evidence must be relevant. *See supra* ¶¶ 39, 43. The prosecutor did not misstate the law.

### c.  *Step three and four statements*

**¶71**        The prosecutor finally told the jury that if it found mitigating evidence, it must "decide how much value to give that particular fact." She said the jury must then determine if the evidence is "enough" to call for leniency. She argued that "[i]f all of you decide there are no mitigating

facts" or that there is "no mitigation sufficiently substantial to call for leniency," the jury "must impose the death penalty."

¶72        Rushing argues these statements were improper for several reasons.   He contends that by asking jurors to assess the value of each mitigating circumstance and then determine whether it is "enough," the prosecutor improperly suggested that jurors should weigh aggravating and mitigating factors against each other, and that they should evaluate each mitigating factor in isolation rather than consider all mitigation collectively against the aggravators.   He also argues that by telling jurors they must impose the death penalty if all jurors find no or insufficient mitigation, the prosecutor incorrectly implied that jurors must unanimously agree on whether a particular piece of evidence is mitigating.   We disagree.

¶73        First, we acknowledge that referring to the "evaluation and assessment of mitigating circumstances as a 'weighing' process" is "technically correct" but "might confuse or mislead jurors."   *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 473 ¶¶ 20–21 (2005).   But the prosecutor never told jurors to weigh mitigating circumstances against aggravating factors.   Instead, she told jurors they "must consider the quality and the strength of the aggravating and mitigating factors," explaining that this assessment is "not a mathematical one" but a judgment based on "each juror's individual, qualitative evaluation of the facts of the case, the severity of the aggravating factors and the quality of the mitigating factors found by each juror."   This argument aligned with the jury instructions and was legally correct.   *See id.* at 473 ¶ 21 (describing the jury's assessment of mitigating evidence as based on "[each] juror's assessment of the quality and significance of the mitigating evidence").

¶74        Second, the prosecutor did not suggest that jurors must unanimously agree on individual mitigating circumstances.   Rather, she repeatedly referred to the assessment of a given mitigating circumstance as an individual determination.   For instance, she told the jurors "[y]ou individually determine whether mitigation exists in light of the aggravating circumstances found" and "individually determine if the mitigation is sufficiently substantial to call for leniency."   Then she explained that what is "sufficiently substantial" depends on "the opinion of the individual juror to persuade that juror to vote for a sentence of life."   The prosecutor did not misstate the law or mislead jurors.

**¶75** In sum, the prosecutor's comments at steps three and four accurately stated the law. Therefore, the prosecutor did not err in making these comments.

　　　　　3. We need not review for cumulative error.

**¶76** Because Rushing has failed to establish a single instance of prosecutorial error, there can be no cumulative error. *See Montoya*, 258 Ariz. at 151 ¶ 54 (finding defendant was not cumulatively deprived of a fair trial because he failed to establish a single instance of prosecutorial error).

**F. We Do Not Address Rushing's Other, Undeveloped Constitutional Claims.**

**¶77** Rushing lists twenty-three other constitutional claims he acknowledges this Court has previously rejected but that he seeks to preserve for federal review. We decline to revisit these claims.

**CONCLUSION**

**¶78** We affirm Rushing's death sentence.